Diana **BROOKS,** Plaintiff,

v.

**ACF INDUSTRIES, INC., d/b/a AMCAR Division, ACF Industries, Inc., Defendant.**

Civ. A. No. 77–3306.

United States District Court, S. D. West Virginia, Huntington Division.

April 29, 1982.

Joseph Martorella, Huntington, W. Va., J. David Cecil, Charleston, W. Va., for plaintiff.

Richard J. Bolen and Barbara L. Ayres, Huntington, W. Va., for defendant.

## MEMORANDUM OPINION

STAKER, District Judge.

Plaintiff, Diana Brooks, filed with the Equal Employment Opportunity Commission (hereinafter, EEOC) charges against the defendant, ACF Industries, Incorporated, etc., based upon the facts and circumstances giving rise to this action, and in proceedings had incident to the filing thereof, all jurisdictional requisites to the institution of this action by her and to this court's having jurisdiction hereof, as provided in 42 U.S.C. § 2000e–5, were fully satisfied.

In her complaint filed here, plaintiff alleged that she was employed by defendant in the paint department of its plant; that defendant awarded her a job in the plant's janitorial department (hereinafter, JD) by transferring her thereto from her job in the paint department; and that thereafter, solely because of her female sex, and thus unlawfully and discriminatorily and in contravention of the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. (hereinafter Title VII), and more specifically 42 U.S.C. § 2000e–2(a)(1) and (2),[1] the defendant transferred her from the JD back to the job previously held by her in the paint department.

Defendant admits that it awarded plaintiff a job in its JD by transferring her thereto from its paint department at her request and admits that it then transferred her from the JD back to the paint department because of her female sex, but defensively asserts that in order to work in defendant's JD, being of the male gender was a bona fide occupational qualification reasonably necessary to the normal operation of defendant's plant, as provided in 42 U.S.C. § 2000e–2(e),[2] and that, plaintiff being a female, defendant's transfer of her from the JD back to the paint department constituted neither an unlawful nor discriminatory employment practice. Plaintiff also defensively asserts that the JD seniority system, which was a part of the plant's seniority system, operated to require defendant to assign plaintiff to perform janitorial duties at one of the plant's bathhouses used by male employees, instead of at another workplace assignment in the JD, and that the plant's seniority system was a lawful and bona fide one pursuant to 42 U.S.C. § 2000e–2(h).[3]

1. 42 U.S.C. § 2000e·2(a)(1) and (2) provide in pertinent part:
    (a) It shall be an unlawful employment practice for an employer—
    (1) to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex ...; or
    (2) to limit, segregate, or classify his employees ... in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's ... sex ....

2. 42 U.S.C. § 2000e–2(e) provides in pertinent part:
    (e) Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis of ... sex ... in those certain instances where ... sex ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise ....

3. 42 U.S.C. § 2000e 2(h) provides in pertinent part:
    Notwithstanding any other provision of this subchapter, it shall not be an unlawful

Thus, the first issue presented here is whether the qualification of being of the male gender in order to be, or to remain, employed in the JD was a bona fide occupational qualification reasonably necessary to the normal operation of defendant's plant (hereinafter bfoq). The second issue is whether the plant's seniority system was a bona fide one that lawfully operated to discriminate against plaintiff because of her sex.

On September 21, 1981, trial was had to the court, which makes the following findings of fact and conclusions of law pursuant to Federal Rules of Civil Procedure, Rule 52:

## FINDINGS OF FACT

The facts are little disputed; the parties rather dispute their import.

1. Defendant operates a plant in Huntington, West Virginia, where it manufactures railroad cars. Routinely, the plant operates two eight-hour shifts each workday.

2. Plaintiff is a 32 year old mother of two children and the wife of Arden Brooks, who is a general foreman at that plant and testified on plaintiff's behalf at trial.

3. Plaintiff first became employed by defendant at its plant on June 6, 1973, as a laborer in the paint department there and thereafter performed different jobs, including operating a welding machine and working in the truck shop and also in the paint department. She was working as an "applicator decalcomania" in the paint department on February 5, 1976, when she applied for transfer to the JD, and she continued to work as such until July 27, 1976, when defendant transferred her to the JD compliant with that application.

4. Prior to and at the time of plaintiff's transfer to the JD, as well as at the time of trial, a total of nine persons worked in the JD, all of whom were male.[4]

5. To provide a temporary replacement for a plant janitor scheduled to commence vacation on July 26, 1976, as well as for other of the janitors who thereafter would be absent from work for various reasons, on January 26, 1976, Mr. William France, defendant's Manager of Industrial Relations and the officer at the plant charged with filling positions in the JD, ascertained that plaintiff remained interested in transferring to the JD, as she had theretofore applied so to do.[5] He then explained to her that the janitorial position available would not be a full-time one, and that whoever filled that position could expect to experience "layoffs" from work. Plaintiff then told him that she would not mind being laid off and accepted the transfer.[6]

6. Plaintiff was transferred to the JD, commenced work therein on the morning of July 27, 1976, and was then assigned to perform duties in the plant's front office, where she worked for four days until the full-time janitor whom she replaced returned from vacation and himself resumed those duties, whereupon plaintiff was laid off until August 9, 1976, when another full-time janitor took vacation.

7. At the time of trial, defendant employed at its plant 7 female and 1238 male

---

employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system . . . provided that such differences are not the result of an intention to discriminate because of . . . sex . . . .

4. Plaintiff testified that seven persons were employed in the JD at the time of her transfer thereto.

5. Mr. France testified that "Before we can hire from outside, we look for requests for transfer from within the plant."

6. Plaintiff testified that notwithstanding that her position in the paint department was grade level 5 and paid a greater wage rate than that of a janitor, which was a grade 1 or 2, she desired the transfer because janitorial work was easier, warmer and less dangerous, and required working less overtime than working in the paint department required.

In her testimony, at first she denied that it was explained to her that she would be frequently laid off if she transferred to the JD; however, in her deposition, she testified that Mr. France told her she would be "laid off a lot" if she transferred thereto.

employees. In 1976, when plaintiff was transferred to the JD, defendant employed a total of 1248 employees, and in 1976 the proportion of male and female employees there was substantially the same as it was at the time of trial.[7]

8. (a) During and since 1976, defendant has provided for the use of its male employees, at different locations on the plant grounds, three large bath-toilet-locker-room facilities, commonly referred to in the evidence as the New Bathhouse, the Old Bathhouse and the Paint Shop Bathhouse (respectively hereinafter New BH, Old BH and Paint Shop BH).

(b) In addition, other bathroom facilities, including urinals and commodes, "spread along the [plant's] assembly lines," were likewise so provided.

(c) The New BH has a first and second floor. Occupying one corner of its first floor is the Women's Welfare Facility, a bath-toilet-locker-room facility provided for use by female plant workers. Although that women's facility is housed on that first floor, it is otherwise completely separate from that of the men's facility on that floor, and unless the contrary is clearly indicated, mention of the New BH herein refers to the men's, as distinct from the women's, facilities in the New BH.

Male janitors perform the janitorial work in this women's facility, but when females are using it, the male janitor assigned to do so absents himself therefrom.[8]

9. (a) On the first floor of the New BH are 4 shower columns, 3 commodes, 3 urinals, 3 wash fountains, 7 benches and 239 lockers, and on the second floor thereof are 8 shower columns, 10 commodes, 8 urinals, 8 wash fountains, 21 benches and 521 lockers.

(b) The Old BH, all on one floor, has 18 shower stalls, 3 commodes, 4 urinals, 4 wash fountains, 4 benches and 309 lockers.

(c) The Paint Shop BH, also on only one floor, has 8 shower heads, 3 commodes, 3 urinals, 1 wash fountain, 1 sink, 8 benches and 122 lockers.

(d) It is clear from the evidence, including the exhibits in evidence schematically showing in detail the floor plans and facilities of all three bathhouses, that the only significant degree of privacy afforded to a user of any of the men's bathhouses is the modicum of privacy afforded by the doors on the toilet (commode) stalls in the New BH and Paint Shop BH, and that the user of any of the other facilities in any of the three bathhouses must do so in the plain view of others then present therein. It is true that from no vantage point inside any of the bathhouses would the beholder have a panoramic view of all the facilities therein, but it is equally true that in the course of changing vantage points, as would a janitor when going about her duties in any one of the bathhouses, the beholder would at one time or another have in view all of the facilities therein.

10. As stated in finding of fact 6 above, after plaintiff's transfer to the JD on July 27, 1976, she worked as a janitor in the plant's front office for four days and was then laid off until August 9, 1976.

In the early morning of August 9, 1976, plaintiff again commenced to work as a janitor, was then assigned to do so at the New BH and very soon after commencing her duties there, she complained to Mr. France that she did not want to work there when men were using that facility.[9]

---

**7.** It is the court's impression that these figures refer to hourly-wage plant employees as distinct from salaried ones. Plaintiff testified that female employees, excluding office ones, at the plant numbered about twenty.

**8.** Testimony was to the effect that if a janitor in any of the men's bathhouses were required to absent himself or herself during its use, then it could never be cleaned. Because of the proportion of women to men employees of the plant, the court agrees that no given one of them could be cleaned during either of the two daily shifts if its janitor were required to absent himself during its use.

**9.** Plaintiff testified at the date of trial that she was then willing to clean the bathhouses while men were using them and that her then expression of such willingness was the first time she had so expressed herself, which marked a change of attitude on her part.

11. As a reaction to, and shortly following, that complaint by plaintiff, defendant shifted one Burrows, a black janitor holding the least seniority of all the janitors except plaintiff, from the Paint Shop BH, where he was then regularly assigned to work, to the New BH, where plaintiff had been assigned to work on that morning of August 9, 1976, and shifted plaintiff to the Paint Shop BH, where plaintiff then undertook to perform her duties, but before she would consent to do so it was necessary for defendant's Mr. Watts to stand at the door of the Paint Shop BH and bar defendants employees, all male, from entering and using it, while she did so.[10]

12. (a) A well-recognized oral seniority agreement or practice (JD seniority system) —regulating the rights among those employed in the JD at any given time preferentially to be assigned to perform job assignments existing therein in accordance with the seniority, in terms of length of service in that department, held by them, respectively—has existed and been adhered to at the plant since at least 1966.

(b) Under the terms of the JD seniority system any janitor holding the greater seniority was entitled at his election to be assigned to perform any work assignment to which any janitor holding the lesser seniority had been assigned to perform, but no janitor was permitted to exercise such election more often than once each forty-five days.

(c) From at least as early as 1966 and up to March 5, 1978, the JD seniority system existed and was adhered to as a matter of practice in the JD notwithstanding that the terms thereof were not specifically expressed in any collective bargaining agreement executed prior to the one dated March 5, 1978, between the defendant and the

United Steelworkers of America (Union), the bargaining agency representing the plant's employees. However, the March 5, 1975 agreement (and perhaps prior ones, though the evidence was silent as to this) did expressly recognize the existence and validity of oral, local agreements and practices such as the JD seniority system by expressly providing that existing oral, local agreements, practices, and customs should continue in effect notwithstanding that they were not specifically expressed in that March 5, 1975 agreement.

(d) The Huntington Plant Supplement to the collective bargaining Master Agreement, dated March 5, 1978, between defendant and the Union expressly included the JD seniority system in its terms by providing, in Section H–3. J. thereof, as follows:

AREA ASSIGNMENTS

... Janitors ... shall be permitted to exercise their seniority within their classification, to select the area in which they desire to work, not more often than once each forty-five (45) days.[11]

13. Holding, as plaintiff did in the JD, the least amount of seniority in terms of length of service of the ten janitors therein, including her, then any of those other nine could elect under the JD seniority system to take from plaintiff ("bump" her from) any job assignment to which she was assigned in the JD.

It was thus impossible for plaintiff to be assigned to, and to continue to perform, any work assignment as janitor in any area other than the New, Old and Paint Shop Bathhouses if some of the other nine janitors exercised their seniority rights to cause themselves to be assigned to all JD work assignments other than the bathhouse ones.[12]

---

**10.** Had plaintiff been a male, no such conflict would have been presented by the use by male plant workers of the Paint Shop BH while janitorial duties were performed therein.

**11.** Mr. Norris Dale Chaney, the janitor having the most seniority, testified that he caused one Chapman, the Union Representative who negotiated the March 15, 1978 collective bargaining agreement, to include janitors expressly in Sec-

tion H–3.J. of the Huntington Plant Supplement to the March 5, 1978 agreement, because "everytime we got a new foreman [in the JD] we had to take it up with him."

**12.** For example, if defendant attempted to resolve the controversy herein by "creating" a job for plaintiff by assigning her a night job cleaning the plant's front offices, as the court gathers defendant considered doing in August,

14. Although the peak periods during which male workers used the three bathhouses were before shifts began, when they came to their lockers in the bathhouses and there changed from the clothes they wore to the plant into their workclothes, which they had deposited in their lockers at the end of the preceding shift worked by them, and after shifts ended, when they again came to their lockers, there removed their workclothes, went to the shower room and bathed, and then returned to their lockers and donned the clothes they wore to work,[13] the three bathhouses were nevertheless in almost continuous, and far greater than casual, use by male employees at all times when the plant was operating, because of the following circumstances most of which routinely occurred from shift-to-shift:

(a) Workers take "early pass outs," that is, leave work during a shift with defendant's permission, because of illness or injury of theirs or their families and various other compelling circumstances that interrupt the daily routines of humankind, such early pass outs averaging about 280 to 300 per day,[14] and most workers who leave work on early pass outs use a bathhouse before leaving the plant in the same manner as is their wont after completing a shift;

(b) Emergency wash-ups—lavations by workers required by their becoming more soiled than usual because of the occurrence of some untoward incident in the course of their work, such as being sprayed by a burst oil hose and the like—require the use of the bathhouses by workers during shifts;

(c) Breakdowns in plant equipment result in employees' being sent home before their shifts are completed, and they generally use a bathhouse as they would upon completion of a shift;[15]

(d) Some male workers eat their lunches in the locker room areas of the bathhouses and while there otherwise make use of the facilities therein; and

(e) Male workers visit their lockers in the bathhouses from time to time during their shifts and then use the bathhouse facilities.

15. The number of janitor-man-hours necessarily spent daily in the actual cleaning of the bathhouses are 5 to 6 hours for the New BH, 3 to 3½ hours for the Old BH and 4 to 4½ hours for the Paint Shop BH. Aside from having to be present therein when cleaning them, the janitors assigned to the bathhouses also must enter them several times each day to give them adequate custodial and janitorial attention.

16. It would be highly impracticable and unreasonable to close the bathhouses to clean them and in so doing deny their male users access to them and their facilities, including the men's access to their lockers housed therein.[16]

17. Plaintiff continued to perform her assignment at the Paint Shop BH on August 9 and 10, 1976, with defendant's Mr. Watts continuing to bar male employees' entry into and use of it while plaintiff worked therein, until defendant's officials met with plaintiff and her shop steward on August 10, 1976, and declared plaintiff to be disqualified to continue to work in the

1976, any other janitor could exercise his seniority rights to take that assignment from plaintiff by bumping her therefrom. Indeed, one of the janitors testified that he told defendant he would bump plaintiff from any such job so created for her.

13. All male workers on every shift did not follow this routine, but the court gathers that by far the vast majority of them did so.

14. A study of early pass outs in two representative months, February and July, 1981, showed that an average of 280 workers took early pass outs daily. Plaintiff's husband testified that about 300 men took early pass outs each day.

15. If employees are required to report for work, they must be paid wages for at least four hours, and in cases of equipment breakdowns' leaving them unable to work at their usual tasks, they are usually kept engaged in various housekeeping and other like activities for at least those four hours.

16. Mr. William France, Jr., testified, without further elaboration, that if any one of the bathhouses, were "closed down, OSHA [Occupational Safety and Health Administration, an agency of the United States] requirements would not be met" by defendant.

JD because of her female sex,[17] and transferred her back to the paint department.

18. Between the time plaintiff commenced to work in the New BH on the morning of August 9, 1976, and defendant's declaring her disqualified to work as a janitor because of her sex on August 10, 1976, the following developments occurred in addition to those above narrated:

(a) Former head janitor James H. Ford, who was also the janitors' shop steward, complained to defendant regarding the transfer of janitor Burrows from his Paint Shop BH assignment to the New BH one, contrary to his seniority rights, and the transfer of plaintiff from the latter to the former;[18]

(b) James L. Smith, President of the Union's Local, also complained to defendant regarding the assignment of Burrows to the New BH from the Paint Shop BH in contravention of his seniority rights;

(c) Mr. Bill Congleton, representative of the National Association for the Advancement of Colored People (NAACP) requested a meeting with defendant regarding the infringement of Burrows' seniority and other rights;[19]

(d) Male workers at the plant complained of their being barred from their use of the Paint Shop BH so that plaintiff would perform her duties therein, and also complained of the prospect of using the bathhouses in the presence of her, a female janitor;[20]

(e) Rumors of the initiation of a strike were bruited about among some of the male workers because of the problems to them

created by plaintiff's working as a janitor at their bathhouses; and

(f) Mr. W. W. Warden of the International Union informed defendant that he had been contacted by officials of the local union and others and enquired as to what the defendant would do concerning the problem.

19. The EEOC found reasonable cause to believe that, in respect to plaintiff, defendant had engaged in an unlawful employment practice proscribed by Title VII, and on September 14, 1977, issued to her "a right to sue" notice,[21] after which, and within the period allowed her as provided in 42 U.S.C. § 2000e–5, she instituted this action.

## CONCLUSIONS OF LAW

Defendant imposed male gender as a requisite qualification to be met before one could work in the JD because of the effect of two factors—for convenient reference, the "privacy factor" and the "seniority factor"—with which defendant was, and on a day-to-day basis would continue to be, confronted should a female work therein.

The privacy factor concerns the right of the hundreds of male employees who use the three bathhouses during any given shift not to be required to undress, dress, shower and perform the grosser biological functions in the presence and view of a female engaged in the performance of janitorial duties assigned to her in one or the other of those bathhouses.

---

17. It is undisputed that plaintiff satisfactorily performed the janitorial duties assigned to her.

18. The Paint Shop BH being a facility much smaller than the New BH, it was defendant's belief that the problems created by plaintiff's working as a janitor in the bathhouses would be of less magnitude if her work were done in the Paint Shop BH instead of the New BH and thus the switch of assignments of Burrows and plaintiff.

19. James H. Ford testified that he had contacted the NAACP and that "if it came to it," he intended to bring a "discrimination charge"

concerning Burrows' removal from his Paint Shop BH assignment to the New BH one.

20. It was testified that not all male plant workers objected to the prospect of having to use a bathhouse in the presence of a female janitor, and that some of them, most of whom were younger males, indicated that they had no such objection—this perhaps a commentary on the not altogether incipient changes in the American ethos pertaining to nudity and the like observable in recent years.

21. Defendant conceded the truth of these facts at a pre-trial conference.

The seniority factor has to do with the manner in which the plant's seniority system operated to give janitors holding the greater seniority their preference, over janitors holding lesser seniority, of job assignments in the JD.

Neither of these two factors, operating alone and in the absence of the other, would have presented any impediment to plaintiff's working in the JD, in that (a) given the seniority factor but absent the privacy factor in the three bathhouses,[22] then assignment of plaintiff to any of the three bathhouses by operation of the seniority factor presumably would have been unobjectionable to any of plaintiff, defendant and the plant workers; and conversely, given the privacy factor, but absent the seniority factor,[23] then defendant freely could have assigned male janitors to the work assignments in the three bathhouses and assigned plaintiff to an assignment at a workplace at which the privacy factor did not exist, such as the janitorial assignment in the plant's front office, and again presumably neither plaintiff, defendant nor any of the employees of the plant would have had any valid objection.[24]

It was rather the synergetic effect produced by each of the privacy and seniority factors operating in the presence of the other that motivated the defendant to declare male gender to be a bfoq for one to work in the JD and upon that ground to transfer plaintiff from the JD back to the paint department.

In brief, those two factors operated to produce that synergetic effect as follows: the plant's seniority system precluded plaintiff from transferring and asserting in the JD the seniority she had accumulated while working in the paint department, and for that reason she commenced working in the JD without any seniority whatever applicable therein. Each of the other janitors working in the JD when plaintiff transferred thereto had greater seniority therein than did she, and under the seniority system, those other janitors could successively "bump" plaintiff from the different work assignments therein until she was relegated to working in one of the three bathhouse assignments if she were to work in the JD at all. In the bathhouse assignments the privacy factor was ubiquitously and ineluctably present. Thus, by dint of the seniority factor, plaintiff was relegated to work a bathhouse assignment and, in turn, was precluded from doing so by the privacy factor present there.

In *Burwell v. Eastern Air Lines, Inc.*, 633 F.2d 361, 369–70 (4th Cir. 1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981), the court commented:

Business necessity as a defense was first defined by the Supreme Court concomitantly with the recognition of disparate impact discrimination. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). BFOQ was explicitly created by statute [703(e)] as a defense to the equally explicit disparate treatment discrimination of section 703(a). To say, however, that the two defenses are mutually exclusive, and each confined to a separate theory of liability would be overreaching. In sex discrimination cases, however, clear disparate impact discrimination will be tested by business necessity and clear disparate treatment discrimination will be tested by a BFOQ defense. *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (footnote omitted).

---

22. E.g., were the proportion of male to female plant workers reversed and the three bathhouses now used by males only be used by females, the privacy factor incident to a female janitor's working in any of the three bathhouses would not exist.

23. E.g., should the seniority system not exist.

24. Such, as conversely stated, would be true only if a minimum of three male janitors were employed in the JD, because if only two were employed therein, then presumably a female janitor necessarily would have to be assigned to perform janitorial duties in one of the three bathhouses, in which event the privacy factor, operating in the absence of the seniority factor, would present the same difficulties as those that exist here with respect to the privacy factor.

The privacy and seniority factors each constituted a separate link in a chain that barred plaintiff from employment in the JD. It is axiomatic that no chain is stronger than its weakest link. The bfoq defense, founded on 42 U.S.C. § 2000e–2(e), is clearly based upon the privacy factor, absent which that defense could not exist.[25] On the other hand, the seniority factor in essence deals with the manner in which the seniority system operates, and if that system is to constitute a valid defense, as defendant asserts, then that system itself lawfully must be a bona fide one under 42 U.S.C. § 2000e–2(h). Moreover, as explained below, the nature of the proof plaintiff must present to establish a prima facie case of disparate treatment discrimination, to which the bfoq defense applies, differs markedly from that she must present to establish a prima facie case of disparate impact discrimination, to which the seniority system defense applies.

Thus, it is necessary that each of the bfoq—disparate treatment issue, involving the privacy factor on the one hand, and the seniority system—disparate impact issue, involving the seniority factor on the other, be examined and decided independently of the other. However, since the two factors, operating in tandem, produced the alleged unlawful discrimination of plaintiff, if either or both of those issues is decided against defendant, then plaintiff must prevail in this action, otherwise not.

## THE BFOQ ISSUE

Applying here the burden of proof and related standards applicable to the disposition of Title VII actions involving this bfoq—disparate treatment issue, as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),[26] and reiterated and explicated in *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the court holds that, as to this issue, plaintiff has established by a preponderance of the evidence a prima facie case of defendant's having committed a discriminatory employment practice by transferring her from the JD solely because of her sex, in that plaintiff's evidence showed—and indeed it was undisputed—(1) that plaintiff is of the female sex; (2) that she applied for and was awarded a job in the JD for which defendant was seeking applicants and for which plaintiff was qualified—i.e., for which she was qualified without regard to whether or not male gender was a bfoq therefor; (3) that, despite her qualifications, she was transferred from her job in the JD; and (4) that, after

---

**25.** Defendant argues that (a) a female's inability to perform a bathhouse assignment due to the privacy factor there present, coupled with (b) defendant's inability to assign a female to a janitorial workplace other than a bathhouse without violating the seniority rights of the other janitors, constituted a legitimate business necessity for the seniority system. Since the privacy factor exists only at the bathhouse assignments and not at the other ones in the JD, but the seniority system nevertheless excluded females from employment in those other ones, defendant's argument is invalid in the court's view.

**26.** *McDonnell Douglas* involved a charge of discrimination in employment based on complainant's race, and the Court said:

The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications....

The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection ....

. . . .

[Complainant then must] be afforded a fair opportunity to show that ... [the employer's] stated reason for ... [complainants] rejection was in fact pretext.

411 U.S. at 802–804, 93 S.Ct. at 1824–1825. However, the Court further commented:

The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required ... is not necessarily applicable in every respect to differing factual situations.

*Id.* at 802 n.13, 93 S.Ct. at 1824.

she was so transferred, that job therein remained open and defendant thereafter sought persons of plaintiff's qualifications as applicants therefor.

Plaintiff having established that prima facie case as to that issue, then—according to *Burdine*—"the defendant bears only the burden of explaining clearly the nondiscriminatory reasons for its actions." 450 U.S. at 260, 101 S.Ct. 1097, 67 L.Ed.2d at 219.

As legitimate, nondiscriminatory reason for its actions, defendant defensively asserted and sought to prove that male gender on the part of employees in its JD was a bfoq reasonably necessary to the normal operation of its plant, and that, being a female, plaintiff was thus disqualified to work in that department.

Thus, the court must decide whether defendant met its burden, and in doing so, must be mindful "that the bfoq exception was in fact meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex." *Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 2729, 53 L.Ed.2d 786 (1977).

The courts have recognized and dealt with the privacy factor in cases involving Title VII sex discrimination issues and in other cases involving issues closely akin thereto.

In *York v. Story*, 324 F.2d 450, 44 (9th Cir. 1963), *cert. denied*, 376 U.S. 939, 84 S.Ct. 764, 11 L.Ed.2d 659 (1964), the court said:

> We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figured (sic) from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.

In *Reynolds v. Wise*, 375 F.Supp. 145, 151 (N.D.Tex.1974), the court held that "[s]elective work responsibilities among correctional officers excluding from the duties of women assignment to dormitories or shake-downs is reasonable to insure privacy of inmates and does not discriminate against women."

In *Sutton v. National Distillers Products Co.*, 445 F.Supp. 1319 (S.D.Ohio 1978), *aff'd*, 628 F.2d 936 (6th Cir. 1980), the court held that the defendant employer's relieving of plaintiff, a female plant guard, from the duty of searching male employees due to the objection of members of the local union did not constitute Title VII sex discrimination.

In *Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079 (8th Cir. 1980), *cert. denied*, 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980), the female complainant was denied, because of her sex, advancement to that rank of correctional officers the duties of which included prisoner strip searches and surveillance of prisoner's showers and toilets, and alleged Title VII sex discrimination. The court recognized that the privacy interests of the prisoners might be invaded should females perform those duties, but held that the defendant had not proved male gender to be a bfoq for advancement to that rank for the reason, *inter alia*, that the defendant had failed to show that it was unable reasonably to rearrange job responsibilities so as to minimize the clash between the privacy interests of the inmates, on the one hand, and the nondiscrimination principle of Title VII, on the other, and upheld the district court's order that complainant be advanced to that rank and be given a functional assignment of duties that would protect any rights of inmate privacy which might exist.

And in *Backus v. Baptist Medical Center*, 510 F.Supp. 1191 (E.D.Ark.1981), *vacated on other grounds, Backus v. Baptist Medical Center*, 671 F.2d 1100 (8th Cir. 1982), in which a male nurse charged Title VII discrimination based on sex, the court held that requiring labor and delivery nurses in the obstetrics and gynecology department of defendant hospital to be female was a bfoq, justified by privacy rights of obstetrical patients as well as by greater administrative costs necessitated by the presence of a female nurse, which would be required to protect the hospital from molestation charges should a male nurse be placed in the hospital's labor and delivery section.

Thus, while using any of the bathhouses, the male employees had legitimate privacy rights that would have been violated by a female's entering and performing janitorial duties therein during their use thereof, and to protect those rights, those male employees were entitled to insist that defendant not assign plaintiff to do so.

No scheme suggested by plaintiff as a means of resolving the conflict between her asserted right so to be assigned, on the one hand, and the privacy rights of those male users, on the other, would be feasible or reasonable.

The first such scheme was that plaintiff be assigned to a given bathhouse and, to avoid their exposing themselves in the locker areas thereof, its male users be required to remove their clean clothes from their lockers located therein, carry them either to the shower room of that bathhouse or to another of the bathhouses, and there perform their showering and undressing, after which they could return their workclothes to their lockers. A second scheme so suggested was that plaintiff be so assigned and defendant be required to erect doors and/or walls which would obstruct the shower and toilet areas from her view from without. A third such scheme was that defendant be required to assign her to perform a janitor's duties on a night shift when the bathhouses were not in use.

Implementation of the first scheme would visit upon the male users of the bathhouse involved inconvenience so unreasonably and intolerably great as to approach, if not actually constitute, hardship. If those male users were required to dress and shower in the shower room thereof, it would be almost impossible for them to keep dry their clothes worn or carried thereto, and they would still be unable to use the toilet facilities in that bathhouse without suffering violation of their privacy rights. If they were required to procure their clothes from their lockers in such bathhouse and repair to another bathhouse to undress and shower, they would not only suffer inconvenience but also loss of their uncompensated time in so doing. In either event they would be delayed in leaving the plant on "early pass outs" as well as after completing their shifts of work. Moreover, the shower facilities would almost certainly thereby be overcrowded. Also, it would unquestionably be necessary for those male users to appear at the plant earlier than otherwise would be required so that they would have adequate time in which to change clothes before the beginning of their work shift.

Assuming that the second scheme could be accomplished at reasonable expense to the defendant—and there was no evidence bearing upon that expense—implementation thereof would be almost as inconvenient to the male users as that of the first scheme. They would still be required to remove their clothes from their lockers and carry them behind the walls or doors defendant would be required to install and to undress there rather than at the sites of their lockers. Installation of walls would not only reduce spatially the presently existing locker area of any of the bathhouses but also would merely divide the milieu in which the conflict exists rather than provide a solution to the conflict itself.

Implementation of the third scheme would be no solution, because all nine janitors in the JD, each of whom held greater seniority than did plaintiff, could "bump" her from such night assignment, and even if none did so, the cleaning of none of the bathhouses required little more than half an eight-hour shift. Moreover, while defendant lawfully could be required to make such adjustment in the assignment of workplaces within the JD as would resolve the conflict, assuming the seniority factor would so permit, *Gunther v. Iowa State Men's Reformatory, supra,* defendant could not be required to create an additional job for plaintiff therein in order to do so.

Nor is the court, under the facts here, able to ideate any reasonable scheme or accommodation that feasibly or reasonably could be implemented by defendant to avoid or acceptably mitigate the conflict between plaintiff's asserted right to be a janitor in one of the bathhouses and the privacy rights of the male users thereof.

In *Chastang v. Flynn & Emrich Co.*, 541 F.2d 1040, 1042–43 (4th Cir. 1976), the court said:

> *Martin Marietta [Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) ] held that under Title VII, disparate treatment on the basis of sex is sustainable only if the employer can show that the disparity is ·*required* either by "business necessity" or by a *bona fide* occupational qualification reasonably necessary to the normal operation of the business. (emphasis added)

The court holds that, in respect to janitors who worked, or by operation of the seniority system could have been required to have worked, in any of the bathhouses, male gender *was* a bfoq required for, and reasonably necessary to, the normal operation of defendant's plant and business.

However, the court further holds that, in respect to janitors who neither worked, nor by operation of the seniority system could have been required to have worked, in any of the bathhouses, male gender *was not* such a required and reasonably necessary bfoq, which brings us to the issue of the legality of the seniority system, because if that system was not a bona fide and lawful one, then defendant cannot claim that that system lawfully required defendant to assign plaintiff to work in a bathhouse when she was employed in the JD.

### THE SENIORITY SYSTEM ISSUE

■ In *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 82, 97 S.Ct. 2264, 2276, 53 L.Ed.2d 113 (1977), the Supreme Court said:

> [A]bsent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences.

Very recently, in *American Tobacco Co. v. Patterson*, —— U.S. ——, —————, 102 S.Ct. 1534, 1535, 71 L.Ed.2d 748 (1982), the Supreme Court remarked and held:

> Under *Griggs v. Duke Power Co.*, 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158] (1971), a prima facie violation of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e *et seq.*, "may be established by policies or practices that are neutral on their face and in intent but that nonetheless discriminate in effect against a particular group." *Teamsters v. United States*, 431 U.S. 324, 349 [97 S.Ct. 1843, 1861, 52 L.Ed.2d 396] (1977). A seniority system "would seem to fall under the *Griggs* rationale" if it were not for § 703(h) of the Civil Rights Act.... Under § 703(h), the fact that a seniority system has a discriminatory impact is not alone sufficient to invalidate the system; actual intent to discriminate must be proved.

The Court further held: "To be cognizable, a claim that a seniority system has a discriminatory impact must be accompanied by proof of a discriminatory purpose." *Id.* at ——, 102 S.Ct. at 1538.

It is then clear that, to have established a prima facie case by a preponderance of the evidence as to this seniority system—disparate impact issue, plaintiff's evidence—or the evidence of the case as a whole—must have established prima facie each of the following elements: (a) under *McDonnell Douglas*, that she was the victim of discrimination at defendant's plant by being denied employment in the JD because of her sex; and (b) under *American Tobacco*, (i) that the plant's seniority system, operating either by itself or in conjunction with the privacy factor, exerted the impact that caused that discrimination, and (ii) that it was the intent and purpose of that seniority system so to discriminate against females.

The court holds that plaintiff established prima facie only those elements (a) and (b)(i), but that plaintiff's evidence did not, nor did the evidence as a whole, establish prima facie that element (b)(ii), namely, that it was the intent and purpose of the plant's seniority system to discriminate against females.

All of the evidence in the case rather shows that the JD seniority system evolved over the years before 1966 at the sufferance of defendant; that at least since 1966 it operated and was recognized and adhered

to in the JD; and that it was given expression in the Huntington Plant Supplement to the collective bargaining Master Agreement dated March 5, 1978, between defendant and the Union, all of which occurred without either defendant's or the Union's having had at any time whatever any inkling, intent or purpose that it, or the plant's seniority system of which it was a part, would operate discriminatorily, much less unlawfully so.

Nor has plaintiff shown, as she was permitted to do under *McDonnell Douglas*, that any of defendant's stated reasons—i.e., those stated by defendant as to defendant's bfoq and seniority system defenses—for defendant's removal of plaintiff from her employment in JD because of her sex were in fact pretext.

Defendant did not articulate any valid "business necessity" to show the seniority system to be a lawful one, nor was it incumbent upon defendant to do so until a prima facie case on the seniority system—disparate impact issue had been established, and as pointed out above, neither plaintiff's evidence nor the evidence as a whole established any such prima facie case.

In respect to the seniority system issue, it being the second issue above posed, the court holds that the plant's seniority system (of which the JD seniority system was an integral part) was a lawful and bona fide one in the context of 42 U.S.C. § 2000e–2(h), and that it did not operate unlawfully to discriminate against plaintiff by denying her employment in JD because of her sex.[27]

The court further holds that defendant was required by that seniority system to assign plaintiff, holding as she did the lesser seniority, to work in one of the bathhouses when all other JD employees, holding as they did the greater seniority, had thereto-

fore exercised their greater seniority rights preferentially to have caused themselves to have been assigned, as they had, to all JD work assignments except the one in the bathhouse to which defendant assigned plaintiff to work.

As to the bfoq issue, it being the first one above posed, the court holds that in respect to all employees in the JD, male gender was required as a bfoq reasonably necessary to the normal operation of defendant's plant and business, as provided in 42 U.S.C. § 2000e–2(e), because in the light of the holding in the two paragraphs next above, even though the privacy factor was present only in the bathhouses and was absent from all other JD workplaces, the seniority system could lawfully operate, as it did, to require those holding the least seniority in the JD, including plaintiff, to be assigned to work in one or the other of the three bathhouses, where females were precluded from working by the privacy factor there present, as was plaintiff, in the same manner as it operated to require defendant to assign plaintiff to do so if she were to work in the JD at all.

The court further holds that defendant has committed in respect to plaintiff no employment practice proscribed as unlawful by Title VII.

## CONFERENCE HELD POST–TRIAL AND POST–*AMERICAN TOBACCO*

It was well after both the institution and the trial of this action that the Supreme Court decided *American Tobacco* and therein held—contrary to what most, if not all, lower courts had theretofore supposed the law to be—that "[t]o be cognizable, a claim that a seniority system has a discriminatory impact must be accompanied by proof of a discriminatory purpose."[28] Thus, at the

---

27. As the court understands the decision in *American Tobacco*, it has no choice but to make this holding in the light of the failure of plaintiff's evidence, and the evidence as a whole, to establish prima facie that it was the intent and purpose of the plant's seniority system to discriminate against females.

28. In plaintiff's complaint, she did not even mention the plant's seniority system, much less allege or claim that it had a discriminatory impact based upon her sex. She need not necessarily have so alleged; in *Teamsters v. United States*, 431 U.S. 324, 347, 97 S.Ct. 1843, 1860, 52 L.Ed.2d 396 (1977), the Court pointed out that "[p]ost-Act discriminatees, however, may obtain full 'make whole' relief, including

time of the trial herein plaintiff and her counsel were unaware that the law required such proof of her. For that reason, and to obviate the possibility of appellate remand of this action for the purpose of affording plaintiff opportunity to offer such proof, this court held an informal conference with counsel for the parties at a time subsequent to the publication of the decision in *American Tobacco*, and the court then informed plaintiff that it would entertain a motion by plaintiff to reopen the trial herein for the purpose of plaintiff's offering such proof, if any she had, and defendant's offering any proof in rebuttal thereof. Some days thereafter plaintiff's counsel informed this court that plaintiff would make no such motion.

An appropriate order will be forthwith entered awarding judgment in favor of defendant and against plaintiff in this action.

Winston C. Baber, in pro. per.

William F. Bailey, Asst. U. S. Atty., New Orleans, La., Andrea Wolfman, Atty., Federal Energy Regulatory Commission, Washington, D. C., for defendant.

retroactive seniority under *Franks v. Bowman [Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444] ... without attacking the

legality of the seniority system as applied to them."