Mary Delia Russaw HARDIN, et al., Plaintiffs-Appellants,

v.

Leroy N. STYNCHCOMB,[1] etc., et al., Defendants-Appellees.

No. 80–9000.

United States Court of Appeals, Eleventh Circuit.

Nov. 22, 1982.

Rehearing and Rehearing En Banc Denied Jan. 7, 1983.

1. The name of this defendant was misspelled in the complaint. The correct spelling, according to his brief, is "Stynchcombe."

Donald P. Edwards, Atlanta, Ga., Charles Guerrier, Cleveland, Ohio, for plaintiffs-appellants.

Richard H. Sinkfield, Rogers & Hardin, Atlanta, Ga., for defendants-appellees.

Before VANCE, KRAVITCH and CLARK, Circuit Judges.

VANCE, Circuit Judge:

Mary Delia Russaw Hardin, a resident of Fulton County, Georgia, applied for a position as Deputy Sheriff I with the Sheriff's Department of Fulton County. When her application was rejected she filed a class action alleging that Leroy N. Stynchcombe, Sr., the Sheriff of Fulton County, the Sheriff's Department and the directors and members of the Fulton County Personnel Board (Personnel Board) engaged in discriminatory employment practices in violation of Title VII, 42 U.S.C. § 2000e et seq., of 42 U.S.C. § 1983 and of the fourteenth amendment of the United States Constitution. Hardin alleges that defendants have discriminated against her and other similarly situated women by failing to consider them for employment as deputy sheriffs and by establishing and maintaining sexually segregated job classifications that unjustifiably exclude qualified females from jobs and job opportunities solely because of their sex.

In August 1975 the Fulton County Sheriff's Department announced seven vacancies for Deputy Sheriff I, an entry-level position with no physical or gender requirements listed in the job description.[2] In September 1975 Hardin took the prerequisite written examination administered by

---

2. The August 1975 announcement of the openings for Deputy Sheriff I reads as follows:

DEPUTY SHERIFF I

Salary Range: $818-$1040

NOTE: Position authorized under the terms of a Comprehensive Employment and Training Act Grant and will expire June 30, 1976.

NATURE OF WORK:

This position is located in the Sheriff's Department of Fulton County. The duties involve varied assignments such as serving

the Fulton County Personnel Board[3] and received a score of 79.47, which ranked her seventh among the seventeen applicants certified as passing the test. The list of applicants forwarded to Stynchcombe by the Personnel Board included the names of Hardin and another woman.[4] Stynchcombe, however, did not interview or consider either female applicant. When Hardin contacted Stynchcombe to find out why she was not called in for an interview he told her the Deputy Sheriff I job openings were in the male section of the jail and that he planned to hire only men to fill those positions.[5]

In October 1975 Hardin filed a charge of employment discrimination with the Equal Employment Opportunity Commission. She received a notice of right to sue in January 1977 and instituted an action in district court naming Stynchcombe, the Sheriff's Department and the Personnel Board as defendants. The district court certified a

class of "all past, present, and future female applicants for the Fulton County civil service position of Deputy Sheriff I and Matron[6] since May 2, 1975" and bifurcated the trial to separate the issue of liability from the question of individual and class relief. Following a four day trial on the merits the district court found that Stynchcombe and the Fulton County Sheriff's Department had discriminated against Hardin on the basis of sex,[7] but that the discrimination did not violate Title VII because sex was a bona fide occupational qualification (bfoq) for the position of Deputy Sheriff I. Hardin filed a timely notice of appeal, seeking reversal of the finding that defendants' intentional discrimination was justified.

This court has jurisdiction under 28 U.S.C. § 1291 and 42 U.S.C. § 2000e–5(j). Because the action was bifurcated by the district court this opinion addresses only the issue of defendants' liability for employ-

criminal warrants, transporting prisoners, supervising the conduct of prisoners and disturbed patients, and maintaining order in the court rooms. These positions may involve duty on any shift and many assignments are hazardous in nature.
QUALIFICATIONS:
Basic requirements for this position are graduation from a senior high school, supplemented by experience in work involving frequent contact with the public, preferably in a law enforcement or judicial setting. Applicants must possess a current Georgia Driver's License. Since enforcement of laws will constitute a portion of the work, consideration will *not* be given to applicants having been convicted of (1) any felony or (2) any misdemeanor *within the preceding five (5)* years. Applicants must be at least 21 but not older than 45 years of age. If interviewed for employment, a high school diploma, GED certificate, or similar document must be *shown.*
*Necessary Special Limitations:*
All applicants must meet the following limitations:
  1.  currently unemployed for 30 consecutive days prior to application date.
  2.  permanent residents of Fulton County *outside* the city of Atlanta.

3. The Fulton County Personnel Board implements the Fulton County Civil Service Act and Rules. The Board administers examinations to prospective applicants for civil service posi-

tions, certifies successful applicants as eligible for consideration for employment and forwards the list of eligibles to the appointing authority in the department that has vacancies to fill.

4. The other woman, Constance E. Smith, ranked third in the group of seventeen.

5. Stynchcombe eventually hired seven males to fill the vacancies. Four of the men had examination scores lower than those of the two women. Three men who scored higher than Hardin were not hired.

6. Although all deputy sheriffs take the same entrance exam and have the same qualifications female deputy sheriffs are referred to as matrons by some members of the Sheriff's Department.

7. The district court found that Hardin failed to state a claim against the Fulton County Personnel Board and its members because the Board had no authority to make hiring decisions or review the hiring decisions made by Stynchcombe. Since the list of eligible applicants submitted to Stynchcombe by the Board properly included the names of the women who passed the examination the Board did not discriminate against Hardin. *Hardin v. Stynchcombe,* No. 77–597A, at 4, 5 (N.D.Ga. Oct. 21, 1980).

ment discrimination, and does not reach the issue of appropriate relief.

## I

Stynchcombe, the appointing authority in the Sheriff's Department, has an unwritten policy of initially assigning new deputy sheriffs to the county jail.[8] There are two bases for this assignment policy: Stynchcombe does not like deputy sheriffs to work in the public eye until they are issued a gun and uniform at the end of a six month probationary period; and assignment of new deputy sheriffs to the undesirable jail positions maintains department morale by reserving preferred positions for employees with more seniority. Stynchcombe also has a policy of assigning only male deputy sheriffs to work in the male section of the jail, and considers hiring female deputy sheriffs only when contact positions are available in the female section of the jail. Defendants claim that this second assignment policy serves to protect the privacy rights of the inmates.[9]

The Fulton County Jail is operated under authority of the Fulton County Sheriff's

---

8. This assignment policy is not inflexible. In the past Stynchcombe has made initial assignments outside the jail and has moved deputy sheriffs out of the jail before the end of the six month period. According to the testimony of Leroy Nelson Stynchcombe, Jr., Chief Deputy Sheriff, the following deputy sheriffs were hired into "preferred" positions without serving a six month probationary stint in the Fulton County Jail: Gene Brown, thirty day temporary assignment to courthouse followed by permanent assignment to court (1971); Jesse Wallace, hired directly into courtroom; John Beach, thirty day temporary assignment to jail followed by thirty day temporary assignment to courthouse followed by permanent assignment; Daniel Blayton, initial thirty day temporary assignment to tax commissioners office; Joseph Booker, initial assignment to courthouse (1973); Gary Gettis, initial assignment to courtroom (1973); Gene Green, initial assignment to radio communication room (1973); Stynchcombe, Jr., initial assignment to courthouse; John L. Hanson, initial assignment to Juvenile Court (1972); James Kay, initial assignment to courthouse (1964); William Pitard, initial assignment to courthouse (1974); Atwood Powell, initial assignment temporary thirty days at jail, then permanent assignment; John Felder, on jail payroll but assigned to Grady Hospital; Carolyn Masson, initially assigned to the courthouse (1978).

In addition, Stynchcombe, Jr., testified that certain deputy sheriffs have in the past been allowed to furnish their own guns and uniforms.

9. Defendants also contend that Fulton County Jail is a maximum security institution with such violent and overcrowded conditions that assignment of women deputy sheriffs to the male section would threaten the security of the jail. The district court noted that it was far from clear that the jail satisfied the Federal Bureau of Prisons definition of "maximum security institution" and supporting its finding that security would not support defendants' bfoq defense as follows:

> The majority of factors the defendants advance as making the jail inherently unsafe for women make the jail equally unsafe for men. Male guards at the jail have been verbally abused, physically assaulted, taken hostage, and defiled by inmates. Jail officials cannot make the determination that the inherent dangers of the job are acceptable for men to risk, but too hazardous for all women. Women can be trained in hand to hand combat techniques, in the use of weapons, and in riot control as readily as can men. There is no evidence that a properly trained female guard would respond any less swiftly or effectively in an emergency than a male guard, would be unable to protect herself or others, or would carry out her duty of maintaining jail security with any less vigor or ability than her male counterparts.
> ... The Fulton County Jail may be distinguished from the penitentiaries in *Dothard* [*v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977),] in its significantly smaller number of sex offenders and the concomitant diminishment in the threat of sexual assault.
> ... The presence of women may, in fact, contribute to the normalization of the prison environment. Female correctional officers are currently successfully employed in several state systems. There is no reason to believe that the threat of sexual assault could not be guarded against or greatly defused by alertness on the part of the female guards and by the common-sense precautionary procedures already followed at the jail to assure the protection of all the deputies. Defendants have not shown that the security of the jail requires that only men be employed as deputies in the male division.

*Hardin v. Stynchcombe*, No. 77–5974A, at 14–15 (N.D.Ga. Oct. 21, 1980).

Department. There are approximately 1,100 inmates in the male section and 50 inmates in the female section. The inmate population is highly transient, with an average stay of under one month. This is because the jail is a holding institution with a population comprised primarily of pretrial detainees, witnesses in protective custody, inmates awaiting the results of an appeal and inmates held on writs to testify or stand trial. Approximately 200 inmates have been convicted and are serving relatively short sentences or are awaiting assignment to a prison.

In the male section of the jail the living quarters are divided into two floors of single occupancy and multiple occupancy cells. The multiple occupancy cells have communal shower and toilet facilities that are visible from the corridors. The single occupancy cells have toilet facilities but no showers, so inmates are removed from those cells at least three times a week in order to bathe. Those inmates dress and undress outside shower stalls in the presence of a custodial deputy and shower in stalls that have transparent plastic curtains.

Approximately forty deputy sheriffs are assigned to the male section of the jail during the day. Twenty to twenty-five deputy sheriffs work the second shift and fifteen to twenty work the third shift.[10] These deputies answer the telephone, operate the television system, work on the floor among the inmate population and work in administration, supervision, supply, maintenance, recreation, hospital and food services. Deputy sheriffs are irregularly rotated among assignments.[11]

Undisputed testimony indicates that the majority of positions in the jail are noncontact positions. Depending on the number of deputies assigned to a shift, two to seven work on the floor patrolling the corridors and escorting male inmates to shower facilities.[12] Deputy sheriffs assisting inmates to and from the recreation area twice a day may be called upon to conduct strip searches of inmates.[13] At least three deputy sheriffs work in the booking office on the day shift, receiving and discharging inmates. These deputies perform strip searches of inmates when floor deputies are not available for that duty, but one of the three always remains in the office while the other two conduct the searches. Male booking office deputies process female inmates, but require female deputy sheriffs to conduct the requisite strip searches. Deputies assigned to other positions within the jail apparently do not routinely perform searches of inmates or patrol the corridors.[14] In the case of emergency, however, all deputies must be available to maintain security and may have to strip search inmates. In addition to the deputies working in the male section of the jail on each shift two deputy sheriffs work in the female section.

---

10. Testimony of Leroy N. Stynchcombe, Sr., Sheriff.

All positions other than contact positions in the female living quarters are considered to be in the male section of the jail and some positions classified under the male section are not actually in the jail. Testimony of Leroy N. Stynchcombe, Sr., Sheriff; A.M. Alexander, Lieutenant Deputy Sheriff.

11. See testimony of Leroy N. Stynchcombe, Sr., Sheriff; A.M. Alexander, Lieutenant Deputy Sheriff; Clifford M. Hufstetler, Lieutenant Deputy Sheriff, Assistant Watch Commander and Lieutenant in Charge of Security on Day Watch; L.B. Eason, Chief Jailer; Leroy Nelson Stynchcombe, Jr., Chief Deputy Sheriff.

12. Testimony of A.M. Alexander, Lieutenant Deputy Sheriff; Clifford M. Hufstetler, Lieutenant Deputy Sheriff, Assistant Watch Commander and Lieutenant in Charge of Security on Day Watch; L.B. Eason, Chief Jailer.

13. It is not clear from the record whether these are floor deputies or deputies temporarily drawn from other assignments. See testimony of Clifford M. Hufstetler, Lieutenant Deputy Sheriff, Assistant Watch Commander and Lieutenant in Charge of Security on Day Watch.

14. See testimony of Leroy N. Stynchcombe, Sr., Sheriff; Clifford M. Hufstetler, Lieutenant Deputy Sheriff, Assistant Watch Commander and Lieutenant in Charge of Security on Day Watch.

One female deputy sheriff and approximately sixty male deputy sheriffs work outside the jail in the courthouse, the juvenile court, and the warrant cars.[15]

## II

▮ Title VII prohibits employment discrimination, which is "one of the most deplorable forms of discrimination known to our society, for it deals not with just an individual's sharing in the 'outer benefits' of being an American citizen, but rather the ability to provide decently for one's family in a job or profession for which he qualifies or chooses." *Culpepper v. Reynolds Metals Co.*, 421 F.2d 888, 891 (5th Cir. 1970), *quoted in Rowe v. General Motors Corp.*, 457 F.2d 348, 354 (5th Cir. 1972). The Act was designed to prohibit both overt discrimination and practices that are fair in form but discriminatory in operation. *Pullman-Stan-*

*dard v. Swint,* —— U.S. ——, ——, 102 S.Ct. 1781, 1784, 72 L.Ed.2d 66 (1982); *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). While either the disparate treatment or disparate impact theory may be applicable to a particular set of facts, *e.g., International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977), the district court analyzed this case under the theory of disparate treatment.[16] In a disparate treatment case an employer is accused of simply treating some people less favorably than others because of their race, color, religion, sex or national origin.[17] *Id.*

Stynchcombe's policy of assigning new deputies to work in the county jail where almost all positions are reserved for males all but eliminates the opportunity of women to gain employment with the Sheriff's De-

---

**15.** Testimony of Leroy Nelson Stynchcombe, Jr., Chief Deputy Sheriff.

**16.** To establish a prima facie case of discrimination under the disparate treatment theory Hardin has the burden of proving that the discrimination of which she complains was purposeful or intentional. Although overt discrimination is rare in this day of sophisticated employers Stynchcombe virtually announces that he did not consider women for the seven Deputy Sheriff I positions. Thus Hardin's prima facie case of discriminatory treatment is established.

The district court incorrectly held that Hardin had to prove her prima facie case of discrimination under the four step procedure set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "In the rare situation in which the evidence establishes that an employer openly discriminates against an individual it is not necessary to apply the mechanical formula of *McDonnell Douglas* to establish an inference of intentional discrimination; the showing has already been made directly." *Ramirez v. Sloss,* 615 F.2d 163, 168 (5th Cir. 1980) (footnote omitted); *accord Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253 n. 6, 101 S.Ct. 1089, 1094 n. 6, 67 L.Ed.2d 207 (1981) (*McDonnell Douglas* formula not inflexible; varies according to facts); *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13 (specification of prima facie proof required not necessarily applicable in every respect to differing factual

situations); *Lee v. Conecuh County Bd. of Educ.,* 634 F.2d 959, 962 (5th Cir. 1981) (*McDonnell Douglas* formulation only one means by which plaintiff may establish prima facie case of employment discrimination); *Gunther v. Iowa State Men's Reformatory,* 612 F.2d 1079, 1085–86 (8th Cir.) (admission of discrimination in promotion on the basis of sex establishes a prima facie case of overt sexual discrimination), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980).

When section 1983 is used as a parallel remedy for violation of section 703 of Title VII the elements of the two causes of action are the same. *Whiting v. Jackson State Univ.,* 616 F.2d 116, 121 (5th Cir. 1980). To establish a violation of the fourteenth amendment equal protection clause Hardin must prove a discriminatory motive or purpose. *Id.* at 122 (citing *Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 256, 97 S.Ct. 555, 558, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *Nevett v. Sides,* 571 F.2d 209, 217–18 (5th Cir. 1978), *cert. denied,* 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980)).

**17.** Cases based on the alternative theory of disparate impact challenge employment practices that are facially neutral in their treatment of different groups, but in fact fall more harshly on one group than another. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

partment.[18] In defense of this overt discrimination defendants assert that the challenged assignment policies are permitted by section 703(e) of Title VII, 42 U.S.C. 2000e–2(e), which allows sex based discrimination when sex is a bona fide occupational qualification.[19] Section 703(e) provides "only the narrowest of exceptions to the general rule requiring equality of employment opportunities." *Dothard v. Rawlinson,* 433 U.S. 321, 333, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977); *Weeks v. Southern Bell Telephone & Telegraph Co.,* 408 F.2d 228, 232 (5th Cir.

1969). Sex based discrimination is valid only if the essence of the business would be undermined by not hiring members of one sex exclusively. *Diaz v. Pan American World Airways, Inc.,* 442 F.2d 385, 388 (5th Cir.), *cert. denied,* 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). Defendants can satisfy that burden only by proving they had a factual basis for believing that all or substantially all women would be unable to safely and efficiently perform the duties of the job. *Weeks,* 408 F.2d at 235.[20] In addition, defendants bear the burden of

**18.** Testimony of Leroy N. Stychcombe, Sr., Sheriff; A.M. Alexander, Lieutenant Deputy Sheriff. *The discriminatory effect of defendants' assignment policy is exacerbated by the fact that, until this lawsuit was filed, only one female deputy sheriff had been rotated out of the prison into a more desirable position. Since the suit was filed Stynchcombe has promoted three female deputies. This recent action cannot excuse his past failure to apply the assignment and rotation policies with an even hand to both male and female deputies. Cessation of employment discrimination in the face of litigation is "equivocal in purpose, motive and permanence."* Jenkins v. United Gas Corp., *400 F.2d 28, 33 & n. 11 (5th Cir. 1968); accord Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 584, 98 S.Ct. 2943, 2953, 57 L.Ed.2d 957 (1978) (Marshall, J., concurring in part and dissenting in part) ("It is clear that an employer cannot be relieved of responsibility for past discriminatory practices merely by undertaking affirmative action to obtain proportional representation in his work force."); *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 341–42, 97 S.Ct. 1843, 1857–58, 52 L.Ed.2d 396 (1977) ("[A] company's later changes in its hiring and promotion policies could be of little comfort to the victims of the earlier . . . discrimination, and could not erase its previous illegal conduct or its obligation to afford relief to those who suffered because of it."), *quoted in Furnco,* 431 U.S. at 579, 98 S.Ct. at 2950 (majority opinion); *Causey v. Ford Motor Co.,* 516 F.2d 416, 422 (5th Cir. 1975) (later job offer could not right earlier statutory wrong).

**19.** Notwithstanding any other provision of this subchapter, . . . it shall not be an unlawful employment practice for an employer to hire and employ employees . . . on the basis of . . . sex . . . in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise . . . .
42 U.S.C. § 2000e–2(e).

For a comparison of the bfoq defense and the business necessity defense available under the disparate impact theory of analysis *see Garcia v. Gloor,* 609 F.2d 156, 163 (5th Cir. 1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981); *Harriss v. Pan Am. World Airways, Inc.,* 649 F.2d 670, 674–76 & n. 2 (9th Cir. 1980); *Gunther v. Iowa State Men's Reformatory,* 612 F.2d 1079, 1086 n. 8 (8th Cir.), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980).

**20.** *Accord Dothard v. Rawlinson,* 433 U.S. 321, 333, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977); *Long v. Sapp,* 502 F.2d 34, 39 (5th Cir. 1974); *Gunther v. Iowa State Men's Reformatory,* 612 F.2d 1079, 1085 (8th Cir.), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980).

The narrow scope of the bfoq exception does not encompass perceptions of male and female roles based upon romantic paternalism or the divine plan for the separation of the sexes. *See, e.g., City of Los Angeles, Department of Water & Power v. Manhart,* 435 U.S. 702, 707, 98 S.Ct. 1370, 1374, 55 L.Ed.2d 657 (1978) (employment decisions cannot be predicated on myth or stereotyped assumptions of male or female characteristics); *Dothard v. Rawlinson,* 433 U.S. at 334–35, 97 S.Ct. at 2729 (Title VII prohibits refusal to hire an individual on basis of stereotyped characterizations of the sexes; purpose of Title VII is to allow individual women freedom to choose dangerous work); *Weeks v. Southern Bell Tel. & Tel. Co.,* 408 F.2d 228, 236 (5th Cir. 1969) (Title VII rejects romantic paternalism and vests individual women with power to decide whether to take on unromantic tasks); *Rosenfeld v. Southern Pacific Co.,* 444 F.2d 1219, 1225 (9th Cir. 1971) (congressional purpose is elimination of subjective assumptions and traditional stereotyped conceptions about physical ability of women to do particular work); *Woody v. City of West Miami,* 477 F.Supp. 1073, 1079 (S.D.Fla.1979) (Title VII prohibits stereotypical culturally-based concepts of ability to perform certain tasks because of sex); *United States v. City of Buffalo,*

proving that because of the nature of the operation of the business they could not rearrange job responsibilities in a way that would eliminate the clash between the privacy interests of the inmates and the employment opportunities of female deputy sheriffs. *Gunther v. Iowa State Men's Re-*

*formatory,* 612 F.2d 1079, 1086 (8th Cir.), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980); *Harden v. Dayton Human Rehabilitation Center,* 520 F.Supp. 769, 779 (S.D.Ohio 1981); *Fesel v. Masonic Home, Inc.,* 447 F.Supp. 1346, 1351 (D.Del. 1978), *aff'd mem.,* 591 F.2d 1334 (3d Cir.

457 F.Supp. 612, 629 (W.D.N.Y.1978) (Title VII intended to strike at entire spectrum of disparate treatment of men and women resulting from sex stereotypes); *Manley v. Mobile County,* 441 F.Supp. 1351, 1358 (S.D.Ala.1977) (chivalry should become neither paternalism nor instrument of employment discrimination against women).

Apparently, however, these theories have not lost credence in the Fulton County Sheriff's Department. For example, in answer to the question, "Do you have any opinion as to the role of women in the Fulton County Sheriff's Department?" Stynchcombe replied: "Well, the answer would be I am not prejudice against women period. In fact, if anything, I have leaned over backwards to help them out. I love them." And, in response to the question, "Does the Sheriff's Department work under any [gender based] affirmative action plan or policy now?" he replied:

Well, the only—the one and only, if you want to call it sex bias or whatever you call it, is what this whole case is all about. Not but one place that I haven't got—I will say I don't want a woman working and I give them the reason is in the men's sleeping quarters of the jail.

If that is discrimination I don't know it but if you feel like calling it that, that is okay. That is the only one I got.

It is not discrimination but I got good reason for the way I am thinking. It is not because of the women. I know I wouldn't want my daughter or my wife to hold that kind of job.

That Stynchcombe is not the only member of the Fulton County Sheriff's Department to believe that protecting women from the harsher things in life does not constitute discrimination is indicated by the following excerpts from the trial transcript:

THE COURT: You feel that everybody in the jail should be prepared in an emergency to do anything that anybody else can do?

THE WITNESS: I certainly do.

. . . .

THE COURT: Why couldn't a woman do this?

THE WITNESS: Because, I have told you before, Judge, I just believe the woman a hazard to us to have a lady involved in such as that. I am not prejudiced.

THE COURT: I know.

THE WITNESS: But I would like to make a point. I am a firm believer that God creat-

ed a lady for man to love and to cherish, and I cannot imagine any woman wanting to put herself in the position of a man. I am not prejudiced, but I cannot see that, I guess maybe that is the way I was brought up, your Honor.

THE COURT: Well, the law has been changed.

Testimony of Deputy Sheriff Clifford M. Hufstetler, Assistant Watch Commander and Lieutenant in Charge of Security on the day watch.

Q. Chief, you indicated that you would have no objections of hiring women to serve in positions in the men's section of the jail, is that right?

A. No, I don't think I said that. I don't think that if it was left to me, this is just one man's opinion, and I may not like what you say, but I'd defend with my life your right to say it, one man's opinion, I am of the opinion that the job is a little too sticky for a female.

I can't conceive within my mind how she could tolerate it, of course, that is one big word, perseverance is another big word; but I see inmates out there that can tolerate more than, you know, your tolerance means a lot psychologically, and I don't see how her tolerance would—she would have to be a giant in that sense.

. . . .

Q. You indicated that there was psychologically and socially men understand men and women understand women. Could you give the Court some explanation of what you mean by that?

A. Well, there has been a psychological difference since time immorial [sic] when God created Adam and Eve, there was a difference. He first created Adam, then he took Adam's rib and made Eve. When they sinned, when I read the Bible, when God walked in the garden, he didn't say anything to Eve, he said Adam, where art thou? He admonished Adam, didn't he?

Q. So you relate Genesis to your assignment policy of the jail?

A. Not necessarily Genesis, I relate Isaiah, I relate Daniel, I relate Leviticus, I can call all sixty-six books in the Bible. I relate Jesus Christ above, we live, move and have our being in Him.

Testimony of L.B. Eason, Chief Jailer, who is responsible for management of the jail and assignment of personnel.

1979); see *City of Philadelphia v. Pennsylvania Human Relations Commission,* 7 Pa. Cmwlth. 500, 300 A.2d 97, 105–06 (1973) (Blatt, J., dissenting).[21]

This court finds that as a matter of law the evidence produced by defendants is insufficient to sustain their bfoq defense. The conclusion of the district court to the contrary is clearly erroneous. *See United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *Usery v. Tamiami Trail Tours, Inc.,* 531 F.2d 224, 233 (5th Cir. 1976); Fed.R. Civ.P. 52(a).

The first component of the challenged assignment policy is that of initially assigning deputy sheriffs to the jail for six months before allowing them to work in other positions in the Sheriff's Department. Stynchcombe admits that this policy is not necessary to provide new deputies with training for other Deputy Sheriff I positions such as courthouse deputy. Rather, the purposes allegedly served by assigning new deputies to the jail are to keep the public from coming into contact with deputies who have not been issued guns or uniforms and to enhance department morale by reserving desirable positions outside the jail for deputies with more seniority.

Defendants have failed to prove that it is of the essence of the business of the Sheriff's Department to assign deputies to the county jail for six months.[22] Stynchcombe has waived the policy on a number of occasions without apparent detriment to the Department. He has in the past hired both male and female deputy sheriffs without requiring them to work in the jail, and has allowed new deputy sheriffs to provide their own uniforms and weapons. There is nothing to prevent a continuation of that practice. In addition, while Stynchcombe's desire to reserve preferred positions outside the jail for more senior deputies might be compelling in the context of a bona fide seniority system arrived at through collective bargaining, see, e.g., *Swint,* —— U.S. at ——, 102 S.Ct. at 1783; *California Brewers Association v. Bryant,* 444 U.S. 598, 605–08, 100 S.Ct. 814, 819–20, 63 L.Ed.2d 55 (1980), it cannot justify this informal assignment policy which all but bars women from the Sheriff's Department.[23]

The second component of the challenged employment practice is that of assigning

**21.** A number of courts have recognized the possibility of avoiding a clash between privacy and employment rights by use of selective job assignments. *See Dothard v. Rawlinson,* 433 U.S. 321, 346 n. 5, 97 S.Ct. 2720, 2735 n. 5, 53 L.Ed.2d 786 (1977) (Marshall, J., dissenting); *Forts v. Ward,* 471 F.Supp. 1095, 1100–01 (S.D. N.Y.1979), *vacated in part,* 621 F.2d 1210 (2d Cir. 1980); *Brooks v. ACF Indus.,* 537 F.Supp. 1122, 1132 (S.D.W.Va.1982); *Backus v. Baptist Medical Center,* 510 F.Supp. 1191, 1197 (D.Ark. 1981), *vacated as moot,* 671 F.2d 1100 (8th Cir. 1982); E.E.O.C. Dec. No. 71–2410, 4 Fair Empl. Prac.Cas. (BNA) 17, 18 (June 5, 1971). *See also* cases cited *infra* note 25.

**22.** We recognize that the district court could have analyzed Stynchcombe's policy of assigning new deputies to the jail under a disparate impact/business necessity analysis rather than a disparate treatment/bfoq analysis. *Cf. Brooks v. ACF Indus.,* 537 F.Supp. 1122, 1130 (S.D.W.Va.1982) (district court separately analyzed the bona fides of a seniority system and a privacy-based bfoq which operated in tandem to deprive a woman of a desired job assignment). *See generally* B. Schlei & P. Grossman, *Employment Discrimination* 292–93 (1976) (dis-

cussion of distinction between the theories of business necessity and bfoq). The district court's choice to analyze both of the challenged components of the assignment policy under the bfoq rubric is not erroneous, however. The operation of the assignment system used in the Sheriff's Department is not unlike that in the more typical bfoq case in which members of one sex are simply prohibited from applying for work.

We find, however, that even if a disparate impact/business necessity test were applied, factual findings of the district court and undisputed evidence in the record indicate that the system of assigning new deputies to the jail is not justified by business necessity. *See, e.g., Jackson v. Seaboard Coast Line R.R.,* 678 F.2d 992, 1016–17 (11th Cir. 1982).

**23.** *Compare Brooks v. ACF Indus.,* 537 F.Supp. 1122, 1133–34 (S.D.W.Va.1982) (bona fide seniority system justified assignment policy that had effect of excluding women from work as janitors) *with Gunther v. Iowa State Men's Reformatory,* 462 F.Supp. 952, 957 (N.D. Iowa 1979) (complaints of senior employees regarding assignment policy that permitted women to work in prison did not create bfoq), *aff'd,* 612

only male deputies to work in the male section of the jail and of considering females for deputy sheriff positions only when there are openings in the female section of the jail. Defendants assert that hiring women to work as deputy sheriffs in the male section of the jail would violate the privacy rights of the prisoners and that any adjustment of job assignments designed to protect both the Title VII guarantee of freedom from employment discrimination and the privacy of the inmates would be unfair to male deputy sheriffs.

Although incarceration or pretrial detention is necessarily accompanied by the loss or restriction of certain rights and privileges, including the right to privacy, an inmate retains those constitutional rights that are not inconsistent with prisoner status. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 545–48, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979); *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Forts v. Ward,* 471 F.Supp. 1095, 1098–99, 1101 (S.D.N.Y.1979), *vacated in part,* 621 F.2d 1210 (2d Cir. 1980). While it is important to maintain order and security within the jail through surveillance and search of inmates by deputy sheriffs the inmates' retained privacy rights may be unnecessarily invaded by having deputies of the opposite sex conduct strip or body cavity searches, or oversee use of toilet and shower facilities.[24]

Hardin is not seeking assignment to duties that would infringe upon inmate privacy, however. Since the majority of the deputy sheriff positions in the male section of the jail do not require performance of strip searches or observation of inmates' use of shower or toilet facilities, it appears that modification of the system of rotating deputy sheriff assignments will avoid the clash between privacy rights and equal employment opportunities without either substantially affecting the efficient operation of the Sheriff's Department or undermining its essential functions. In other correctional institutions it has been found possible to preserve the privacy of inmates while employing guards or correctional officers of the opposite sex,[25] and defendants have failed to prove that similar accommodations cannot be made in this case. This burden of proof is not met by defendants' assertion that all jail personnel must be available to assist in emergencies, regardless of sex, *Hudson v. Goodlander,* 494 F.Supp. 890, 894 (D.Md.1980) (temporary violation of inmate privacy during emergencies justified by necessity of protecting inmates and officers);

F.2d 1079 (8th Cir.), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980).

**24.** *See, e.g., Gunther v. Iowa State Men's Reformatory,* 612 F.2d 1079, 1087 (8th Cir.), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980); *Hudson v. Goodlander,* 494 F.Supp. 890, 891, 893 (D.Md.1980); *Forts v. Ward,* 471 F.Supp. 1095, 1100–01 (S.D.N.Y.1978), *vacated in part,* 621 F.2d 1210 (2d Cir. 1980).

**25.** *See, e.g., Gunther v. Iowa State Men's Reformatory,* 612 F.2d 1079, 1086–87 (8th Cir.), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980) (possible to develop narrowly-drawn job classifications for correctional counselors to protect inmate privacy); *Hudson v. Goodlander,* 494 F.Supp. 890, 893–94 (D.Md. 1980) (selective work assignments protect both inmate privacy and women's equal employment opportunities); *Forts v. Ward,* 471 F.Supp. 1095, 1100 (S.D.N.Y.1978) (adjustment of facility and work assignments of male guards in female prison protects inmate privacy) *vacated in part,* 621 F.2d 1210 (2d Cir.

1980); *Mieth v. Dothard,* 418 F.Supp. 1169, 1185 (M.D.Ala.1976) (three-judge court) (tension between individual's right to employment without regard to sex and inmates' right to privacy can be resolved by selective work responsibilities rather than by selective job classifications) *aff'd in part, rev'd in part sub nom. Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Reynolds v. Wise,* 375 F.Supp. 145, 151 (N.D.Tex.1974) (held Bureau of Prisons could make selective work assignments to protect inmate privacy without discriminating against women). *Cf. Manley v. Mobile County,* 441 F.Supp. 1351, 1358 (S.D. Ala.1977) (sheriff of Mobile County, Alabama, violated Title VII by refusing to hire a female for a job in a maximum security jail that only involved minimum prisoner contact); E.E.O.C. Dec. No. 71–2410, 4 Fair Empl.Prac.Cas. (BNA) 17, 18 (June 5, 1971) (accommodation of certain psychic needs of patients "obviously would not justify the total exclusion of males (or females) from the nursing profession").

*Gunther v. Iowa State Men's Reformatory,* 462 F.Supp. 952, 957–98 (N.D.Iowa 1979) (difficult to imagine emergency situations in which trained women could not function; suggests strip searches be left to male officers), *aff'd,* 612 F.2d 1079 (8th Cir.), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980); *United States ex rel. Wolfish v. Levi,* 439 F.Supp. 114, 160 (S.D. N.Y.1977) (emergent necessity justifies exception to rules protecting inmate privacy), *aff'd in part and rev'd in part, Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), or by the administrative inconvenience of rearranging assignments. *Gunther,* 462 F.Supp. at 957 (citing *Reed v. Reed,* 404 U.S. 71, 75–76, 92 S.Ct. 251, 253–54, 30 L.Ed.2d 225 (1971)).[26] Of course, if Hardin is assigned to a position outside the jail inmate privacy rights will not be implicated.

■ Defendants have failed to prove that it is essential to the functioning of the Sheriff's Department that all new Deputy Sheriffs I be initially assigned to the Fulton County Jail. Defendants have also failed to prove that they cannot rearrange job responsibilities so that female deputies assigned to the male section of the jail will not have to perform duties that impinge upon inmate privacy rights. Failure of proof concerning either component of the assignment policy, standing alone, would be sufficient grounds for this court's decision to reverse the district court's opinion holding that sex is a bfoq for the position of Deputy Sheriff I.

■ This court does not purport to dictate to the defendants the proper job assignments for Fulton County deputies. We hold only that the bfoq exception to Title VII does not justify defendants' arbitrary practice of funneling deputy sheriffs through positions reserved almost exclusively for males. The judgment of the district court is accordingly reversed and the case is remanded for further proceedings.

REVERSED AND REMANDED.

CLARK, Circuit Judge, dissenting:

I would affirm the decision of the district court because my examination of the record does not reflect that the court's conclusion was clearly erroneous. The majority, in order to reverse, suggests that women hired as deputies could either be (1) excused from the assignment to the county jail or (2) excused from assignments within the jail which would invade the inmates' privacy. The record reflects that employment and retention of qualified jailors is an ongoing challenge for the defendant. The "suggestions" of the majority would place Hardin and other women employed by the sheriff in preferred positions over men, complicating the personnel moral factor.

The majority makes the following finding of fact:

Hardin is not seeking assignment to duties that would infringe upon inmate privacy, however. Since the majority of the deputy sheriff positions in the male section of the jail do not require performance of strip searches or observation of inmates' use of shower or toilet facilities, it appears that modification of the system of rotating deputy sheriff assignments will avoid the clash between privacy

---

**26.** Defendants also argue that making selective work assignment of female deputy sheriffs will discriminate against male deputies. If defendants' allegations were established, this argument would raise serious questions. We conclude, however, that defendants have not met their burden of proof on this issue. *See Gunther v. Iowa Men's Reformatory,* 612 F.2d 1079, 1086 (8th Cir.), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980); *Harden v. Dayton Human Rehabilitation Center,* 520

F.Supp. 769, 780 (S.D. Ohio 1981). Since Stynchcombe also asserts that female deputy sheriffs working in the jail have the "softest job in the Sheriff's Department," *accord* Testimony of L.B. Eason, Chief Jailer, it would appear that selective job assignment of female deputies within the male section of the jail and elsewhere in the Sheriff's Department will serve to equalize the duties of female and male deputy sheriffs.

rights and equal employment opportunities without either substantially affecting the efficient operation of the Sheriff's Department or undermining its essential functions. In other correctional institutions it has been found possible to preserve the privacy of inmates while employing guards or correctional officers of the opposite sex, and defendants have failed to prove that similar accommodations cannot be made in this case.

691 F.2d at 1373 (footnote omitted). The district court explicitly found, however, that the overcrowding of the jail and the understaffing of supervisory personnel make such accommodations for women guards impossible in the Fulton County Jail. Record at 590. This finding of fact may not be set aside by this court unless clearly erroneous. Fed.R.Civ.P. 52(a); *Pullman-Standard v. Swint,* —— U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).

The majority opinion cites cases where prisons have been able to accommodate the assignment of female prison guards, but the facts in those cases do not compare to the problem here. The record makes clear that this jail has multiple dormitory quarters with open showers and a transient population with about 25 percent of the inmate population convicted of or charged with violent crimes. The Fulton County Jail situation is further complicated by the disproportionate number of inmates to prison guards, with a ratio of about 20 to 1. This compares to a ratio of 8.5 to 1 at the Atlanta Federal Penitentiary, a maximum security institution at which women are not hired as jailors. The following excerpts from the district court's order illustrate the conditions existing in the jail and provide the basis for my disagreement with the majority opinion:

Jail administrators refer to the Fulton County Jail as a "maximum security institution." Due in large part to overcrowded conditions, the jail environment is volatile and hostile. Deputies in the male division of the jail are subjected to daily verbal and, in some instances, physical abuse by inmates. Inmates have been known to throw urine on the deputies as they pass the cells, and physically confront and attack deputies on occasion.

\* \* \* \* \* \*

Record at 581 (footnote omitted).

Although not all deputies are assigned to floor duty during any one shift, deputies are rotated within the jail to different assignments in order to limit the opportunity of deputies and inmates to become overly familiar with each other. This irregular rotation is required as a result of past charges alleging that deputies have been bribed by inmates, or have provided contraband and weapons to the inmates. The rotation rule helps to minimize the occurrence of such incidents, and to insulate the deputies from false charges.

\* \* \* \* \* \*

Record at 582.

The evidence was overwhelming that the overcrowding of the jail and the understaffing of supervisory personnel make the possibility of exempting women from certain duties, such as taking inmates to shower facilities or performing strip searches, an impossibility. All personnel are required and must be prepared to do any job at any time. There are not sufficient personnel on duty at any one time to permit the scheduling of male deputies to fill in for the female deputies who would be barred from certain contact functions, or to accommodate the rotation of duties required by the Sheriff to minimize deputy-inmate familiarity. The ratio of guards to inmates at the jail is already disproportionate. Redefining the duties of the Deputy Sheriffs I at the jail to insulate some deputies from toilet or shower surveillance or strip searches would disrupt and further burden the already overloaded and overworked Sheriff's Department. Defendants have shown that no assignment of selective job

responsibilities can be made that will permit the employment of members of both sexes in the male section of the jail.

\* \* \* \* \* \*

Record at 590–91.

There was ample testimony at trial that duty inside the jail is singularly unpleasant, and that it is an administrative necessity for the Sheriff to be able to rotate deputies out of the jail after a period of time and into other jobs. This concern is more than simply an accommodation of employee expectations or administrative convenience. To permit female Deputy Sheriffs I to avoid duty at the jail and to be given preference in other job assignments would be unfair to all the employees. This court does not believe that the proscriptions of Title VII against job discrimination require that either the jail administration or the other deputies be put to undue hardship or sacrifice to accommodate female employees.

Record at 591.

My dissent from the majority is not based upon a different view of the law, but upon a different assessment of the facts. The majority opinion correctly cites several cases in which courts have held that the administrative difficulties inherent in hiring women as guards in male prisons were outweighed by the policy considerations of Title VII. Other cases have weighed facts and arrived at the opposite conclusion. *E.g., Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1976). This case presents another judgment call to determine whether the BFOQ exemption or business practices exception was supported by these specific facts. I find the district court's conclusions amply supported. While I recognize that another judge might find differently, I cannot agree with the majority's conclusion that "as a matter of law the evidence produced by defendants is insufficient to sustain their bfoq defense." 691 F.2d at 1372.

Employment in the Fulton County Jail encompasses assignments in administration, supply, maintenance, food service, recreation and hospital services, in addition to duties on the floors among the inmates. Individuals willing to perform the demanding job in the jail should be rewarded by opportunities for participation in all of the assignments at the jail and promotion to the non-jail preferred jobs. Permitting women or men to have selected jail assignments, or preferred jobs without performing any jail duty, is unfair to the other individuals employed and to the sheriff who has to recruit them. I respectfully dissent.