**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 25-10226

Non-Argument Calendar

————————————

TRACY R. ANDERSON,
SAGELINE LAURENT,
REBECCA MORALES,
JEFFREY S. THOMAS,

*Plaintiffs-Appellants,*

MAURICIO GUERRERO, et al.,

*Plaintiffs,*

*versus*

SECRETARY, U.S. DEPARTMENT OF HOMELAND
SECURITY,

*Defendant-Appellee.*

———————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:22-cv-02941-VMC-CPT

———————————————

Before JILL PRYOR, BRANCH, and BLACK, Circuit Judges.

PER CURIAM:

This litigation arises from the decision of the United States Customs and Border Protection (CBP) at the Port of Tampa to designate three night shifts as shifts for females only in order to have female CBP Officers (CBPOs) available to conduct personal searches on female travelers.[1] Tracy Anderson, Sageline Laurent, Rebecca Morales, and Jeffrey Thomas (Officers)[2] appeal the district court's order denying their motions for judgment as a matter of law, which argued the policy of designating female-only shifts violated Title VII of the Civil Rights Act of 1964. The Officers contend the district court erred in determining there was sufficient evidence for the jury to conclude that CBP's policy was justified by a bona fide occupational qualification (BFOQ) that female CBPOs conduct

---

[1] The CBP handbook provides that "[a] CBP officer conducting a personal search . . . must be of the same gender as the person being searched, except when the officer conducts an immediate patdown for officer safety." Additionally, a witness of the same gender must also be present for all searches except for "immediate patdowns for officer safety." The Officers do not challenge the CBP's policy of same gender searches.

[2] Two other plaintiffs—Steven Peak and Mauricio Guerrero—also joined the complaint, but later dismissed their claims.

and witness searches of female travelers because there were viable alternatives that the CBP could have implemented. Specifically, the Officers assert CBP could have: (1) used non-CBPOs to perform or witness searches, or (2) paid overtime to bring in off-duty female CBPOs when necessary. After review,[3] we affirm the district court.

Judgment as a matter of law is appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party on [an] issue." Fed. R. Civ. P. 50(a)(1). We will not substitute our judgment for that of the jury as long as the jury's verdict is supported by sufficient evidence. *Bailey v. Swindell*, 89 F.4th 1324, 1329 (11th Cir.), *cert. denied* 145 S. Ct. 162 (2024). Nor will we assume the jury's responsibility to weigh conflicting evidence or to assess the credibility of witnesses. *Brown v. Ala. Dep't of Trans.*, 597 F.3d 1160, 1173 (11th Cir. 2010).

Under Title VII's federal-sector provision, all personnel actions affecting employees in military departments or executive agencies must be made free from any discrimination based on sex. 42 U.S.C. § 2000e-16(a). Federal employees, unlike private employees, are protected from unlawful discrimination that plays a role in an employment action, even if it does not affect the final decision or ultimate action. *Terrell v. Sec'y of Veterans Affs.*, 98 F.4th 1343,

---

[3] We review de novo the denial of a motion for judgment as a matter of law, drawing reasonable inferences in the light most favorable to the nonmoving party. *Bailey v. Swindell*, 89 F.4th 1324, 1328-29 (11th Cir.), *cert. denied* 145 S. Ct. 162 (2024).

1351-52 (11th Cir. 2024) (applying this standard to Title VII). Title VII provides the following defense to a claim of discrimination:

> [I]t shall not be an unlawful employment practice for an employer to hire and employ employees . . . on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.

42 U.S.C. § 2000e-2(e)(1). In other words, an employer may discriminate based on sex when sex is a BFOQ. *Hardin v. Stynchcomb*, 691 F.2d 1364, 1370 (11th Cir. 1982). This narrow exception permits sex-based discrimination only if the business's essence would be undermined without the policy. *Id*. We have stated that employers have the burden to show that, for example, "because of the nature of the operation of the business, they could not rearrange job responsibilities in a way that would eliminate the clash between the privacy interests of the inmates and the employment opportunities of female deputy sheriffs." *Id*. at 1371.

The district court did not err in determining there was sufficient evidence for the jury to find that CBP's policy of assigning female-only shifts was justified because sex was a BFOQ. First, while CBPOs "have the authority to demand the assistance of any person in making any arrest, search, or seizure authorized by any law enforced or administered by customs officers, if such assistance may be necessary," 19 U.S.C. § 507(a)(2), there was sufficient evidence for the jury to determine the use of non-CBPOs to conduct

searches on female travelers was not viable, *see Hardin*, 691 F.2d at 1371. As the Officers note, the CBP at the Port already turned to local police, TSA agents, and airline employees to aid in searches when two female CBPOs were not available. However, Assistant Director Robert Diaz testified at trial that, despite the availability of this option, the CBP had conducted searches of female passengers that did not comply with its policies and failed to conduct searches on female passengers when they should have been performed. Daniel Nieto, the president of the Officers' union, testified that Tampa police officers and TSA agents were not always available to assist with searches, there was no guarantee there would be a female officer available, and even if the police were willing to assist, there could be a long delay before they could help.

Even if these non-CBP employees were available, there was sufficient evidence for the jury to conclude that it would not be viable for the CBP to rely on non-CBPOs to conduct searches. Kenneth Wetzel, who had previously worked at the Field Operations Academy where new officers were trained, testified that CBPOs received extensive training in the use of firearms, defensive tactics, and less-lethal force options, which was necessary because officers could encounter combative travelers. Wetzel also testified that CBPOs had to understand the limits of their search authority under the border search exception to the Fourth Amendment—training that TSA agents and local law enforcement would unlikely have received. Wetzel believed that, without this training, CBPOs could not rely on other individuals to conduct or witness a search. Commander Guiellermo Barragan also testified that CBPOs were the

most qualified people to conduct and witness searches because of their training and that he would not be comfortable letting non-CBPOs aid in searches because they would not be aware of CBP's policies and procedures. And although Anderson and Director Alyssa Lynette Morris testified they had previously used non-CBPOs without issue in their respective ports, Anderson also testified that CBPOs receive specialized training and that she underwent 16-18 weeks of training when transferring from being a CBP agricultural specialist to her role as a CBPO. Therefore, although there was conflicting evidence as to non-CBPOs' ability to help with searches, there was sufficient evidence for the jury to conclude that this alternative was not viable. *See Brown*, 597 F.3d at 1173; *Hardin*, 691 F.2d at 1371.

The Officers argue the district court erred because the evidence showed the use of non-CBPOs was rare, and that the evidence was insufficient to show that use of non-CBPOs would jeopardize the agency's operations. Although the parties disagree on the exact number of noncompliant searches of female travelers, there was evidence that some number of noncompliant searches occurred. These noncompliant searches were sufficient for Assistant Director Diaz to be concerned for travelers and for his employees. Furthermore, although the Officers argue the CBP had authority to compel non-CBPOs to assist with searches, and the statute allows the CBPOs to demand assistance, the CBP's Personal Search Handbook emphasized this authority should be used only when another CBP officer was unavailable. 19 U.S.C. § 507(a)(2). Accordingly, there was sufficient evidence for the jury to conclude

25-10226                 Opinion of the Court                 7

that relying on non-CBPOs to conduct searches was not a viable option.

There was also sufficient evidence for the jury to conclude that it was not viable for the CBP to pay off-duty female CBPOs overtime to report to work to search female travelers. The district court took judicial notice of the regulation requiring CBP management to assign overtime shifts in a manner that minimizes cost to the government. 19 C.F.R. § 24.16(d)(2) ("All work assignments should be made in a manner which minimizes the cost to the government."). Assistant Director Diaz testified that overtime had been paid to female CBPOs to conduct searches, but that CBPOs still conducted searches that violated agency policy. He further testified there were logistical problems with relying on overtime because it could be hard for management to reach off-duty employees, and even if they could reach them, a passenger would need to wait for a CBPO to arrive to perform the search. Morales testified that, while she had previously reported into work on an overtime basis to assist with a search and that she could do so in a reasonable amount of time, she also stated that there was no guarantee that officers would always be available. Her testimony that it would take her 30 minutes to arrive is a real, tangible harm to the traveling public, not just an administrative burden to CBP.

The Officers argue the jury could not have relied on the overtime regulation to discount this alternative because it involved regulatory interpretation, which is a matter of law. This argument fails because the jury could have reasonably made the factual

determination that foregoing overtime payments would minimize costs, and the additional costs of overtime made it an unviable option. *See Bailey*, 89 F.4th at 1329.  The Officers' argument that the costs of implementing its overtime alternative would be minimal compared to the CBP Port of Tampa's overtime expenditure fails for a similar reason.  Even if the costs were slight relative to total overtime expenditures, we would not reverse the jury's determination that the costs were high enough to discount this alternative. *See Brown*, 597 F.3d at 1173.

There was sufficient evidence for the jury to conclude that CBP had no way to rearrange job responsibilities to eliminate the conflict between its CBPOs' Title VII rights and compliance with its search policies.  *Hardin*, 691 F.2d at 1371.  Thus, we affirm.

**AFFIRMED.**