Raymond J. TORRES, Franklin J. Utz, and Gerald F. Schmit, Plaintiffs,

v.

WISCONSIN DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Taycheedah Correctional Institution, Nona J. Switala, Individually and In Her Official Capacity, Certain Unnamed Defendant Employees of the Wisconsin Department of Health and Social Services, individually and in Their Official Capacity, Defendants.

Nos. 83–C–627 to 83–C–629.

United States District Court, E.D. Wisconsin.

May 16, 1986.

Joseph H. Pomeroy, Dale L. English, Jerold E. Murphy, Colwin, Fortune, Colwin, Pomeroy & English, S.C., Fond du Lac, Wis., for plaintiffs.

John R. Sweeney, Asst. Atty. Gen., Madison, Wis., for defendants.

## DECISION AND ORDER

WARREN, District Judge.

This case concerns plaintiffs' claim of reverse sex discrimination pursuant to their employment as male prison guards at a female prison. Accordingly, plaintiffs seek relief pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (1976) ("Title VII"). An eleven-day court trial was conducted on this matter commencing July 23, 1985, during which various fact and expert witnesses offered testimony. Furthermore, prior to trial, the Court conducted a tour of the facilities at the subject female prison, Taycheedah Correctional Institution ("TCI"). The following constitutes the Court's findings of fact and conclusions of law.

### Background

#### I. The Plaintiffs

1. Plaintiff, Raymond R. Torres, is an adult male resident of Fond du Lac, Wisconsin, 48 years of age. He is currently employed by the Wisconsin Department of Health and Social Services (DHSS), Division of Corrections (DOC), as a Correctional Officer 2. Torres became employed by DHSS in 1975 and was initially employed as a CO-1 at Waupun State Prison ("WCI"). He worked in various cell halls and units of the institution, ultimately being promoted to CO-3 (Sergeant). In December, 1978, Torres transferred from Waupun Correctional Institution to TCI at the urging of his wife so that he would be working closer to his residence. The transfer was as CO-3.

2. Plaintiff, Frank J. Utz, is an adult male resident of Fond du Lac, Wisconsin, 56 years of age. He is currently employed by DHSS, Division of Corrections as a CO-2. Utz was initially employed by DHSS in April of 1967 and worked as a Youth Coun-

selor I at the Kettle Moraine Correctional Institution. He spent 5 years there, rising to a CO-3 and spent 5 years at the Winnebago State Camp. In 1979 he transferred to TCI as a CO-3.

3. Plaintiff, Gerald Schmit, is an adult male resident of Fond du Lac, Wisconsin, 41 years of age. He is currently employed by DHSS, Division of Corrections as a CO-2. Schmit began working for DOC at 22 years of age. After 6 months at WCI he moved to a job at Mercury Marine. Approximately a year later he again went to work for DOC as a CO-1 and has been with the Division continuously since then. He left WCI in 1975 and transferred to TCI as a CO-3 after passing a promotional exam.

DHSS has three classifications for its correctional officers ranked, as follows, in ascending order: Correctional Officer 1 (CO-1); Correctional Officer 2 (CO-2); and Correctional Officer 3 (CO-3). At TCI officers from all three classifications are stationed in the housing units.

All correctional officers, regardless of sex, receive the same training and are offered educational courses, including courses that teach the officers how to interact with, relate to, and perceive the inmates.

Generally speaking correctional officers are responsible for the security, custody, control and treatment of inmates according to the statutes, administrative rules, institutional policies, post orders, and work rules. The specific job duties for a given post are set forth in "post orders" for that particular post. Each post at TCI is assigned a number and written orders for each numbered post are available from the shift lieutenants.

Posts in correctional institutions in Wisconsin are governed by contract and are filled by qualified officers on the basis of seniority. The CO-3 stationed in a housing unit and in charge thereof is sometimes referred to as the "sergeant." TCI further distinguishes its correctional officers staffed in the housing units by designating

certain positions as that of "rover." Generally, the rover's duties entail "roving" the corridors of the various housing units to ensure that order and security are maintained. Occasionally a rover will fill in for other correctional officers stationed in the housing units while they are on break.

As indicated, Torres, Utz and Schmit each transferred into TCI from elsewhere in the system. This occurred in 1978, 1979 and 1975 respectively. They were all CO-3's in housing units at TCI working primarily first and second shift. As house sergeants their station was in an office on the first floor of each floor and primarily their duties are performed in that office although at times the housing sergeant must perforce go into various areas of the living unit for which he is responsible. It is undisputed that the plaintiffs were competent and qualified CO-3's and that they performed their duties satisfactorily. No claim is made by defendants that any plaintiff was demoted because of a deficiency of performance.

### II. The Defendants

The Wisconsin Department of Health and Social Services is the largest branch of the state government. It has its principal office in Madison, Wisconsin, and through its Division of Corrections ("DOC") is responsible for the operation and administration of all of the institutions in the Wisconsin correctional system.

The defendant Taycheedah Correctional Institution is a prison for females operated by DHSS. It is the only women's maximum security prison in Wisconsin, and is located on an attractive wooded site just below the Niagara escarpment on the eastern outskirts of Fond du Lac, Wisconsin. It is surrounded by a cyclone fence topped with barbed wire. The grounds are roomy and well cared for. There are a variety of administrative, activity and utility structures on the grounds, but this case deals with the housing units. Four of these buildings—Harris Hall, Addams Hall, Neprud Hall and Grover Segregation Unit house the inmates and are (except for Grover) the living units which contain officer positions presently unavailable to the plaintiffs as the result of the BFOQ at issue herein.

Defendant Nona J. Switala, is the Superintendent of TCI and has been such since September, 1978. Prior to assuming said responsibility she was the Director of Treatment and Services at TCI for about 3 years.

### III. Taycheedah Correctional Institution

All of the residence halls at Taycheedah are masonry buildings with three residence floors. The buildings have varying dates of construction and varying floor plans. Grover Hall was just finished in 1983. It contains the inmate receiving and orientation facilities, segregation area, health services, control center and visitation center. The plaintiffs were never posted as CO-3's in Grover inasmuch as the BFOQ plan had been put in place prior to the construction of that hall.

TCI was originally a women's prison. In July 1975 DHSS designated the Wisconsin Home for Women a co-correctional institution, changed the name to Taycheedah Correctional Institution and transferred male inmates and some male officers there. This situation continued until February, 1978. Then TCI again became a prison for females only. It houses minimum, medium and maximum security inmates, all felons. During Switala's tenure it has housed between 173 and 200 female inmates.

Each housing unit's staffing patterns presently vary—and have varied in the past—depending upon the security classification of the building. Staffing is done around the clock with three shifts: 6 a.m.–2 p.m.; 2 p.m.–10 p.m.; 10 p.m.–6 a.m.. Each unit always has at least one CO-3 (Sergeant) working each shift. The post of such officers is an office on the first floor of each building and the majority of a sergeant's duties are performed right there.

In addition to the CO-3 on duty, each housing unit has a varying number of CO-1's and CO-2's, depending upon the securi-

ty classification of the inmates housed therein, the physical layout of the building, and the types of activities requiring supervision. Throughout the years under scrutiny these staffing patterns have varied greatly as changes occurred in the institution and its policies.

### Neprud

From 1978 through March 1985, Neprud Hall was classified as the maximum security building. A sergeant was stationed on the first floor on each shift throughout this period. The other staffing patterns at Neprud varied during this period to the extent as follows: 0–2 correctional officers on the first floor during the first and second shifts; 1–3 correctional officers on second floor during the first and second shifts; 1–2 correctional officers on third floor during the second and third shifts; and 0–1 correctional officers on second and third floor during the third shift.

From March, 1985 to the present Neprud Hall has been classified as the minimum security building and is staffed by a sergeant and a CO–3/rover on the first and second shifts and by a sergeant and another correctional officer on the third shift.

### Harris

From 1978 to September, 1982, Harris Hall was classified as the minimum security building. The staffing patterns during this time were as follows: in 1978 and 1979 there was a sergeant on the first floor for all three shifts, and a correctional officer on third floor for first and second shift; from 1980 to September, 1982, there was only a sergeant on the first floor for all three shifts. In September, 1982, Harris Hall was classified as the medium security building and remains such today. It was staffed with a sergeant on the first floor and a correctional officer on the third floor during all three shifts. There was also a correctional officer on the second floor during first and second shift. This pattern was altered slightly in March, 1985, by putting a correctional officer on the third floor only during the third shift. This remains the current staffing pattern at Harris Hall.

### Addams

From 1978 to September, 1982, Addams Hall was classified as the medium security building at TCI. The staffing pattern varied during this period. However, one sergeant was always stationed on first floor and 1–2 correctional officers were always stationed on third floor during each shift. Moreover, during first and second shift there was always 0–1 correctional officer stationed on first floor and 1–2 correctional officers stationed on the second floor.

In September, 1982, Addams Hall was re-classified to the minimum security building and was staffed with a sergeant on the first floor and a correctional officer on the third floor during all three shifts and by a rover during first and second shifts.

In March, 1985, Addams Hall became the maximum security unit and was staffed with a sergeant on the first floor, a correctional officer on second floor and a rover during first and second shifts. This is the current pattern at Addams.

### Grover

In late 1983, TCI opened Grover Hall which contains a segregation unit, health service unit, and the receiving and orientation unit. The staffing at Grover is not pertinent or necessary to the resolution of the case.

Currently, inmates in Harris, Addams, and Neprud Halls are housed in single, double and multiple occupancy rooms. The inmates' rooms in the housing units are not cells but rather resemble college dormitory facilities. Each room has a bed for each inmate, desk, chair and light. The rooms have solid doors. Each door has a clear glass window in the door measuring approximately 4" x 6" at eye level. Windows in each room are standard, without bars, and can be raised a few inches to allow air circulation but generally not enough to allow a body to pass between the raised window and the sill.

All of the rooms in the housing units contain a toilet and a wash basin. In 1983, hospital-style privacy curtains (Ex. 612) were installed around the toilets in the

rooms in Neprud and Harris Halls. These curtains are suspended from the ceiling and can be drawn around the toilet when in use, thereby leaving only the occupant's feet visible. Prior to the installation of these curtains, inmates in multiple occupancy rooms could not shield themselves from being viewed by their inmates—or someone peering through the glass window (unless a "privacy card" described below was in place)—as they dressed or performed personal hygiene or toilet functions. Eventually all rooms in the housing units will have privacy curtains.

Since before 1975, inmates have been permitted to place small rectangular pieces of cardboard, termed "privacy cards" over the observation windows on the doors during nightime hours. Since the cards were placed on the outside of the door, and were capable of being lifted sometimes, in 1976 inmates were given permission to cover the observation window with a privacy card on the inside of the room door for up to 10 minutes while dressing or using the toilet. Since 1983 the policy has been that from 9 p.m. to 6 a.m. inmates are permitted to have the privacy cards continuously over the window only on the outside of the door. They may still use the cards on the inside for the 10 minute maximum.

Each floor in the residence halls has a shower room equipped with from one to three shower stalls and one to three toilet stalls. Some shower rooms also have one or more tubs. Prior to the installation of the individual toilets in each room, the shower rooms also constituted the toilet facilities. Each of the shower rooms has a solid door opening to the hallway. Some of these doors have windows but these have been rendered opaque. Each shower stall is equipped with a curtain or screen which shields the inmate from view while occupying a shower stall. The toilets in the shower rooms are located in stalls with solid doors and only an inmate's feet are visible while occupying a toilet in the shower stalls. No privacy screens have ever been provided in the shower rooms.

Except in the present minimum security building (Neprud) institution policy is that generally only one inmate may occupy the shower room at any one time. However, roommates are permitted in the shower room together. Inmates wishing to shower must sign up for shower time with the floor officer; are allowed 15 minutes in the shower room; and must go to and from the shower room in modest dress, wearing at least a robe or housecoat. In the routine shower procedure correctional officers have no occasion to see an inmate undressed. Only in emergencies or in cases of rule violations would a correctional officer see an inmate in any state of undress.

Prior to and since the implementation of the BFOQ plan the correctional officers did not and do not routinely enter the shower rooms while the rooms are occupied by inmates.

The correctional officers at TCI perform body counts at specified times throughout the day (7:30 a.m.; 12:30 p.m.; 5:30 p.m.; 9:30 p.m.; and once an hour on the third shift) and the inmates are all aware of the times when these counts are to be performed. Counts at night are done by the correctional officers by looking in the room observation windows. Inmates are not required to wear nightclothes, but appropriate sleepwear is available from the institution. Night counts do not result in an inmate being observed unclothed unless the inmate takes no steps to cover herself. The officers taking night count are required to "see skin" to verify the presence of each inmate.

The Wisconsin Administrative Code recognizes three varities of searches which are appropriate to a correctional institution. All three are performed at TCI. Pat searches (1) may be performed at any time with certain restrictions and requirements, and are performed while the inmate is fully dressed. The inmate must empty all her pockets and then the searching officer runs her hands over the inmate's entire body. The Wisconsin Administrative Code does provide that opposite gender correctional officers may perform pat searches, how-

ever all witnesses made it clear that at TCI an unwritten rule is that only female officers can perform pat searches there. Strip searches (2) must be authorized by a lieutenant; are performed only in private, and only by officers ·of the same sex as the inmate, except in an emergency. Body cavity searches (3) are not considered to be within the duties of correctional officers. They are performed only by medical personnel. Correctional officers do enter inmate's quarters for room searches, but these are uniformly performed while the inmates are out of the room.

It is undisputed that when male correctional officers were stationed within the housing units at TCI, searches were adequately and routinely performed by available female correctional officers without impairment of TCI's security.

## IV. The TCI BFOQ Policy

In recent years, of course, the DHSS, as all Wisconsin state agencies, has had an official policy of equal opportunity employment. In January of 1977, DOC formalized a policy that mandated equal opportunity employment in all of its correctional facilities save those where invasion of inmate's privacy was a regular and relatively continuous requirement of the correctional employee's job.

In August, 1978, the Wisconsin Division of Corrections authorized all correctional institution superintendents to submit requests for gender based bona fide occupation qualification (BFOQ) posts. It specified concern with problems like strip searches, gang showers, and living unit supervision. Responding to the authorization in September, 1978, TCI's then Acting Superintendent proposed that five correctional officer posts in TCI's housing units be subject to BFOQ. Only one of these posts was staffed by a CO-3. This plan was never formally approved by the DOC.

In June, 1980, DHSS approved a different BFOQ Plan for TCI ("the Plan") which had been prepared by defendant TCI Superintendent Nona J. Switala. It called for 19 of the 27 CO posts in the residence halls, including all of the CO-3 posts, to be BFOQ'd. The Plan was gradually put into operation, beginning on September 1, 1980 with completion scheduled for September 1, 1982. The phasing in of the Plan was to be accomplished by a gradual process of "attrition"; that is those posts BFOQ'd under the Plan would, as vacancies therein occurred, only be filled with female officers. Posts subject to the Plan which were still held by a male occupant as of September 1, 1982, would be vacated then and replacements would be only female.

Prior to the Plan all CO positions at TCI were open to all qualified officers without restrictions as to gender. With full implementation of the BFOQ of 18 CO-3 positions at TCI 15 of the Sergeant (CO-3) positions (all of the CO-3's in the residence halls) were restricted to females. With full implementation in September, 1982, each plaintiff lost his CO-3 post in the housing units and was involuntarily demoted in rank to a CO-2. These demotions occurred solely because of plaintiff's sex. Plaintiffs were removed from their supervisory posts and are now working under female CO-3's with less seniority and less experience than plaintiffs. Presently, except for two "rover" posts on the first and second shifts, all correctional officer posts in the housing units, including every CO-3 post in those units is BFOQ.

The Plan at TCI was not created to meet specific allegations of inmate's privacy being violated by male officers—but rather because the rules for assigning posts and shifts between officers grew increasingly complex and to have a posting procedure that would recognize seniority, officer's personal desires, institutional requirements, and still have enough female CO's present at all shifts to insure what the institution felt was necessary for inmate privacy. The administration decided to go BFOQ when there were insufficient female officers present to meet institutional needs. Testimony at trial established that an occasion never did actually arise. With the full implementation of the Plan at TCI male correctional officers at that institution are prohibited from working in, promoting to,

or transferring to any position that has been BFOQ'd.

Although all three plaintiffs were involuntarily demoted, their wages were "red circled" and they continue to receive the hourly wage rates of CO–3's. They have however received a marked contraction in the number of posts at the institution to which they may aspire. Utz claims a loss of overtime and associated benefits in the amount of $4,967.93 as of June 30, 1985; Torres an amount of $1,168.76 as of said date. Plaintiff Schmit does not claim such losses.

The Wisconsin Division of Corrections operates some six other adult correctional institutions (Waupun, Green Bay, Dodge, Fox Lake, Kettle Moraine, and Milwaukee). None of the other adult institutions operated by the state, including the Women's Correctional Center in Milwaukee, have any posts denominated BFOQ. Female CO's are used in the male residence halls of male correctional institutions. Female correctional officers employed at male prisons in Wisconsin testified at trial that they routinely conduct inspections of the shower and toilet areas at those prisons and often see male inmates in various stages of undress at those prisons. Furthermore, they are authorized, and sometimes required to conduct pat searches on male inmates.

## DISCUSSION

As a preliminary matter, the Court notes that the defendants named in the caption are still the defendants of record in this case. In a post-trial letter to the Court, defendants' counsel states that the only remaining defendant in this action is DHSS. Plaintiffs' counsel responds that all of the named defendants are employers within the terms of Title VII and are, therefore, still appropriately in this lawsuit. All defendants were named upon this lawsuit's commencement and none of them have presented motions to be stricken or dismissed from this action. At this late juncture, the Court is unwilling to dismiss various defendants upon its own motion unless it is glaringly apparent that such

defendants do not belong in this lawsuit. The Court perceives no such circumstances.

### I. The Purpose And Scope Of Title VII

Title VII prohibits discrimination in employment on the basis of sex by a state or by its agencies. Discrimination against either sex is prohibited by Title VII. *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 386 (5th Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971). The Bona Fide Occupation Qualification (BFOQ) exception to this prohibition is contained in 42 U.S.C. § 2000e–2(e) which provides in pertinent part:

> Notwithstanding any other provision of this subchapter ... it shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis ... of sex ... in those certain instances where ... sex ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise ...

This exception is to be interpreted narrowly. *Dothard v. Rawlinson*, 433 U.S. 321, 324, 97 S.Ct. 2720, 2724, 53 L.Ed.2d 786 (1976); 29 C.F.R. § 1604.2(a). Accordingly, mere administrative convenience is insufficient to justify a BFOQ exception. *Gunther v. Iowa State Men's Reform.*, 612 F.2d 1079, 1087 (8th Cir.1980). Rather, this exception allows "discrimination based on sex ... when the essence of the business operation would be undermined." *Diaz v. Pan Am. World Airways, Inc., supra*, at 388. Further, where an employer seeks to use the BFOQ exception because of a perceived potential infringement of its clients' or customers' privacy, the employer must demonstrate that it could not rearrange job responsibilities or engage in alternative practices to minimize or eliminate the conflict between the perceived privacy interests and the equal employment rights. *See Gunther, supra* at 1086; *Hardin v. Stynchcomb*, 691 F.2d 1364, 1370–71 (11th Cir. 1982).

■ In the present case, by virtue of the fact that defendants subjected certain correctional officer positions to BFOQ based on sex, plaintiffs are not obligated to establish a *prima facie* case of sexual discrimination pursuant to the requirements of *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1972). *See Harden v. Dayton Human Rehabilitation Center*, 520 F.Supp. 769, 777 (S.D.Ohio 1981). The discrimination is an established fact by virtue of the agency policy of "overt discrimination." Consequently, the defendants bear the burden of proving that the discrimination against plaintiffs falls within the narrow terms of the BFOQ exception. Courts have described this burden as a heavy one. *Fesel v. Masonic Home of Del., Inc.*, 447 F.Supp. 1346, 1350 (D.Del.1978), *aff'd* 591 F.2d 1334 (3d Cir.1979), and have held the BFOQ exception to be justified only in rare, appropriate circumstances. *Manley v. Mobile County, Ala.*, 441 F.Supp. 1351, 1357 (S.D. Ala.1977).

## II. Defendants' Asserted Justifications For the BFOQ Plan

■ Defendants contend that the Plan is justified because of security, privacy and rehabilitation concerns. Initially, plaintiffs argue that defendants are now precluded from asserting security and rehabilitation as justifications for the Plan since the only stated reason for the Plan upon its creation and implementation was to ensure inmate privacy. Security and rehabilitation are, plaintiffs contend, improper *ex post facto* justifications for the BFOQ plan. The Court need not determine whether security and rehabilitation were actually reasons for the Plan's creation and, if not, whether defendants are thereby precluded from presently asserting these factors to establish the Plan's propriety, since defendants have failed to show that security, privacy or rehabilitation would be diminished at TCI absent the Plan.

### A. Security

To be sure, security or protection of the public, staff and inmates through adequate supervision during confinement is a basic objective of the Wisconsin correctional system. Appendix, Wis.Adm.Code § HSS 306.03 (August 1980). Thus security constitutes at least part of the essence of the activity of the defendant employers and under the concepts of *Diaz supra*, employment of only one sex in a BFOQ'd position would be permissible only when that essence would be undermined should this discrimination not occur.

The court in *Griffin v. Michigan Department of Corrections*, 31 Empl.Proc.Dec. (CCH) ¶ 33,482, November 12, 1982, slip. op. (E.D.Mich.1982) concluded that in order to prevail on a BFOQ defense the employer must show: (1) that the essence of the activity in question would be undermined by the employment of one sex (here males) in the positions in dispute; (2) that there is reasonable cause to believe that all, or substantially all, members of one sex (here males) would be unable to perform the job duties in question safely and efficiently; (3) that failure to allow members of one sex (here males) to work the positions in question was based on actual sexual characteristics rather than upon sterotyped assumptions; and (4) that there were no less restrictive alternatives which could have been utilized to avoid the BFOQing of the positions in question.

Plaintiffs contend that defendants have not and cannot establish any of these factors. Defendants argue they have. Each of these constitute factual conclusions. Examining the evidence in this trial the Court is forced, somewhat against its own culturally induced proclivities, to conclude that defendants have, indeed, failed to establish any of the four positions used in the *Griffin* analysis.

Testimony established that male correctional officers successfully filled all of the presently BFOQ'd positions from 1975 until the advent of the Plan in the fall of 1982 without any contention that TCI suffered from a lack of security. There seemed to be no dispute that TCI was secure *before* and *after* BFOQ. Male CO's were used to

restrain violent inmates before and after BFOQ. If security was a basis upon which the Plan was sought the Court finds no aspect of security that suffered as a consequence of permitting both sexes in any positions at TCI.

Nor does the Court believe that all or substantially all males, otherwise qualified, such as the three plaintiff sergeants, could not perform the duties of CO–3's in the living quarters safely and efficiently. They had in the past and there is no intimation that the BFOQ was activated because of a deficiency on the part of any plaintiff.

There was no effort by defense to show that BFOQ Plan was created because of some actual sexual characteristics rather than upon steryotyped assumptions. The positions were BFOQ simply because the defendants felt that they should be filled by females—not because of some essential characteristic—but simply because they were of the same sex as the inmates.

On the issue of less restrictive alternatives the Court finds that no administrative alternatives to a BFOQ plan were considered when the Plan was advanced to HSS. The Plan was proposed to enhance inmate privacy and because of a perceived anxiety that in order to meet the demands of adequate staffing patterns, "bid" requests, seniority rights, and shift and vacation needs, a point might come where there would not be sufficient female personnel on duty at a given time to provide for those functions that required females by institution policy. Testimony was that it got "tough" to be sure enough females were available on certain shifts following the posting procedure. The Court finds as a matter of law that before an employer-defendant can overcome the strong policy against sex discrimination and avail itself of the narrow exception of a BFOQ it must establish that no administrative alternatives are available or feasible that can avoid overt sex discrimination. The Court finds as a fact that the defendants did not attempt to utilize administrative alternatives or procedures to accomplish their institution goals without violating the national policy against sex discrimination. Failure to do so destroys one of the requirements for a BFOQ defense. *Hardin v. Stynchcomb, supra.*

The Court notes that prior to the Plan's implementation various procedures employed in the TCI housing units were designed to ensure inmate privacy despite the presence of male officers. That is, for example, prior to the Plan's implementation, TCI inmates could use privacy cards in accordance with the procedures described above and as a result, correctional officers did not routinely observe inmates unclothed during established activities for shower and toilet use. The defendants contend that observation is the core of security. An argument favoring the Plan's validity would be that the correctional officer positions within the housing units had to be BFOQ'd so that these procedures could be abolished. However these procedures were not abolished and remained intact subsequent to the Plan's installation. It seems clear that these arrangements were designed to ensure inmate privacy as to all persons and not just as to male correctional officers. Consequently, the Plan does not enhance security within the housing units by allowing for the modification or elimination of routine procedures designed to increase inmate privacy, but which also, it could be argued, reduced security.

Moreover, defendants' presented no evidence showing that prior to the Plan's implementation security was diminished because of male correctional officers' inability, due to administrative code mandate and TCI unwritten rule, to perform searches. Finally, defendants have not presented any evidence that inmate escapes have been significantly reduced or that order within the housing units has increased after the Plan's implementation. The Court finds that defendants have failed to justify the Plan based on security reasons.

## B. Rehabilitation

At trial, defendants attempted to justify TCI's BFOQ Plan based on a theory of the unique rehabilitation needs of the female inmate. This theory's premise is that prior

to incarceration a large number of inmates at TCI (approximately 60%) had been physically or sexually abused by males. Because of this abuse, the theory continues, female inmates are uncomfortable with the presence of males in the housing units, which presence thereby deters their rehabilitation. Defendants contend that this theory can be used as a basis for distinguishing between male and female prisons and the use of opposite gender correctional officers therein.

Defendants presented various witnesses familiar with the field of corrections who testified in support of this theory. In opposition, plaintiffs also presented witnesses familiar with the field of corrections who testified that the presence of male correctional officers in the housing units would have a beneficial effect on inmate rehabilitation.[1]

Defendants offered only a *theory* of rehabilitation as a justification for the BFOQ Plan. They offered no objective evidence, either from empirical studies or otherwise, displaying the validity of their theory. Indeed, Superintendent Switala testified that there had been no change in the recidivism rate at TCI from 1980 to the present. The Court refuses to find the Plan valid based strictly on the unproven rehabilitation theory presented by defendants at trial. Accordingly, the Court holds that the TCI BFOQ plan is not justified based on rehabilitation concerns.

### C. Inmate Privacy

Although defendants were permitted at trial to argue their positions regarding security and rehabilitation as justifications for the BFOQ Plan, memos from Larry Tainter, Chief of Personnel and Administrative Services make it clear that from the point of view of DHSS the need to establish a BFOQ could only be based on the need to protect inmate privacy. The Court has already determined that within the context of

this case's factual framework, security and rehabilitation are inadequate bases upon which to validate a BFOQ. The defendants' position then must rise or fall on the need to ensure inmate privacy. Plaintiffs respond with two arguments. First, plaintiffs contend that inmates have no constitutional right to privacy and, therefore, inmate privacy concerns cannot be used as a justification for employment discrimination. Second, plaintiffs assert that even if inmates possess privacy rights, they would not be violated by employing male correctional officers in the housing units at TCI.

*Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1973), instructs us on p. 555, 94 S.Ct. on p. 2974 that:

Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen....

In its opinion, after this foundational statement, the Court goes on:

But though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime.

*Id.* The court then lists some of those rights which prisoners retain (privacy is not among those listed).

One of those rights which is necessarily limited as the result of one's incarceration is the right to be free of unwanted intrusions into one's personal privacy. *Bonner v. Coughlin,* 517 F.2d 1311 (7th Cir.1975), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978). Any rookie being drafted into the armed forces will instantly recognize the parallel. These contradictions of the right of privacy follow from the responsibilities imposed upon prison authorities when convicted individuals are committed to their care. Carrying out those responsibilities justify such intrusions as observation, pat-down searches, frisk searches, even body-cavity searches. *Bell v. Wolfish,* 441

---

1. Various courts have recognized that opposite gender correctional officers can enhance inmate rehabilitation by contributing to the normalization of the prison's atmosphere. *Bagley v. Watson,* 579 F.Supp. 1099 (D.C.Or.1983) (N.D.Cal.

1984); *Forts v. Ward,* 471 F.Supp. 1095, 1099 (S.D.N.Y.1979), *rev'd in part on other grounds,* 621 F.2d 1210 (2d Cir.1980); *Hardin v. Stynchcomb,* 691 F.2d 1364 (11th Cir.1982); *Doe v. Duter,* 407 F.Supp. 922, 925 (W.D.Wis.1976).

U.S. 520, 542, 99 S.Ct. 1861, 1875–76, 60 L.Ed.2d 447 (1979). In *Smith v. Fairman*, 678 F.2d 52, the Seventh Circuit Court of Appeals had occasion to consider the collision between institutional needs and the still vaguely defined right of personal privacy. It noted that in *Dothard, supra,* the Supreme Court upheld an Alabama policy against employing female guards in contact positions at the state's male maximum security prison, but also noted that the Court's holding rested entirely on the uniquely dangerous conditions within that state's prison and opined:

It thus appears that in the absence of those conditions, a state may not legally refuse to hire women as guards in a male prison. *See Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079 (8th Cir.), *cert. denied*, 446 U.S. 966 [100 S.Ct. 2942, 64 L.Ed.2d 825] (1980).

The Seventh Circuit in *Smith* then went on to state that *Gunther* does not mean that inmates are entirely without constitutional protection against invasions of their privacy by members of the opposite sex. It surveyed *Forts v. Ward*, 471 F.Supp. 1095 (S.D.N.Y.1979) vacated in part, 621 F.2d 1210 (2nd Cir.1980) where that circuit held that surveillance of female inmates in a maximum security facility while undressed, using toilet facilities, showering or sleeping violated their right of privacy and that on the facts in that case, the rights of the male guards to equal opportunity "must in some measure give way to the right of privacy." Continuing a survey of cases on point, the Seventh Circuit panel said:

the resulting conflict between these two interests has normally been resolved by attempting to accommodate both interests through adjustments in scheduling and job responsibilities for the guards.

*Smith, supra,* at 55. With the plethora of cases advanced by both sides before it, this Court cannot agree with plaintiffs' first contention that inmates lack absolutely any constitutional rights to privacy; *Hardin v.*

*Stynchcomb, supra,* at 1373 (inmates retain some privacy rights).

Such a conclusion leads perforce to a further examination of the facts in the case at bar. The accommodations between privacy interests and institutional requirements were being made throughout the history of TCI as recounted by all witnesses. It is ironic that a conclusion that further accommodation was too difficult seems to have played some role in seeking the BFOQ. The Court is convinced that further efforts at administrative adjustment could have precluded this stark clash between privacy and equal opportunity. Such further efforts should have been pursued.

Inmates at TCI can use privacy cards while dressing or using the toilet facilities in their rooms. Moreover, two of the three residence halls have privacy curtains installed around the toilets in the rooms and the other hall is expected to be soon equipped with similar privacy curtains. The procedures within the housing units at TCI do not involve correctional officers observing inmates in the nude while they shower. An examination of the correctional officer routine within the TCI housing units reveals that correctional officers, both male and female, would never see an unclothed inmate except during an emergency or where the inmate voluntarily displays her unclothed self or fails to avail herself of the procedures designed to protect her privacy. Based on this and on the Court's personal inspection of the TCI housing units, the Court finds that the system in place at TCI sufficiently protects the inmates' privacy rights without the need for a BFOQ plan.[2]

Based on these findings, the Court holds that defendants have failed to establish the validity of the TCI BFOQ Plan. Accordingly, the Court hereby ORDERS the Plan's abolishment and the reinstatement of the plaintiffs in their previous CO–3 positions. The only remaining issue is plaintiffs

2. This finding is bolstered by the defendant's use of the non-BFOQ'd rover in the housing units as described above.

Torres' and Utz' damages claim based on lost overtime.

### III. Damages

■ Torres and Utz contend that they suffered monetary damages because they could not work overtime for those positions designated as BFOQ. These plaintiffs presented the testimony of a Certified Public Accountant, David Klumpyan, who calculated the damages allegedly incurred. Mr. Klumpyan calculated these damages by first determining Torres' and Utz' percentage of overtime hours worked of the total overtime hours worked by all TCI correctional officers during the four years preceding the Plan's implementation in 1982. He then took this percentage and multiplied it by the total overtime hours worked by all TCI correctional officers for the years 1983, 1984 and 1985 (through 3–31–85). The resulting product was Mr. Klumpyan's estimate of the overtime hours that Torres and Utz would have worked in the years 1983–1985. From this product Mr. Klumpyan subtracted the overtime hours actually worked by Torres and Utz to arrive at the loss of overtime hours experienced by these plaintiffs. Defendants contend that this method is too speculative to justify an award of damages for loss of overtime.

The Court finds that the method used to determine Torres' and Utz' loss of overtime is specious, at best. The Court first notes that the amount of overtime hours actually worked by these plaintiffs was apparently not affected by the Plan. For the years 1979–1982 Utz worked 362, 316, 278 and 120.5 overtime hours, respectively. For the years subsequent to the Plan's implementation, 1983–1985 (through 3–31–85), Utz worked 335.4, 397 and 229 overtime hours, respectively. As for Torres, during the years 1979–1982 he worked 0, 29.5, 143.5 and 40.25 overtime hours, respectively. For the years 1983–1985 (through 3–31–85), Torres worked 116.5, 50.86 and 52 overtime hours, respectively.

Based on these figures, the Court is unable to see how Torres and Utz were adversely affected in terms of lost overtime opportunities because of the Plan's implementation. Plaintiffs' method used to calculate their loss, which relies primarily on calculating the percentage of overtime worked by them of the overtime worked by all TCI correctional officers, seems contrived and illogical absent any showing why plaintiffs' overtime worked varies with the amount of overtime worked by all of their colleagues. It seems more likely that the reasons why one chooses to work overtime are indigenous to that person and are unrelated to whether that person's colleagues choose to work overtime. Accordingly, the Court hereby finds that plaintiffs Torres and Utz have failed to establish monetary damages in this case and DENIES the same.